## Case No. 4,593.

The EXCHANGE.

[10 Blatchf. 168.][1]

Circuit Court, S. D. New York. Sept. 23, 1872.

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

Charles Donohue, for libellants.
Benjamin D. Silliman, for claimants.

WOODRUFF, Circuit Judge. The libel herein was, I think, properly dismissed, upon either of several grounds, involving fault in the bark Ellingwood, the libellants' vessel, injured by the collision with the Exchange, and also on the ground, irrespective of fault in the bark, that the Exchange was itself free from fault.

It is true, that having respect only to the private interests and merely personal rights of the parties, the law has no favorites. Owners of ferry-boats have not, in their own behalf, any exclusive privileges of navigation over owners of other vessels. But it does not follow that the business of running a ferry between two crowded cities, where tens of thousands of persons pass and repass daily, and must necessarily pass at all hours of the day, and in all weather, is not governed by rules which, on the one hand, involve more stringent responsibility for care, vigilance, and caution, and, on the other, secure to them more than ordinary diligence on the part of others, for their protection. The ferries between New York and Brooklyn are a public necessity. Their managers are, more than ordinary carriers, either of freight or passengers, public servants. The public are especially interested in the good management and safe conduct of these ferries. Hence, they are largely under the control of the authorities of the state and city.

It is not necessary to hold, that, from this, results such an exclusive privilege, that the interests of commerce are to be disregarded, or that navigation is to be unnecessarily hindered. So far as possible, the running of the ferry-boats, and the navigation of the river by ordinary boats and vessels, are to be harmonized, so that neither may impede the other. But, by so much as the protection of large numbers of human lives, the prosecution of the daily business, and even the maintenance and support, of large numbers, cast upon the managers of the ferries the duty to be prompt, regular, active, vigilant, and careful, by so much, the same considerations cast upon others the duty of abstaining from whatever will make the management of the ferry needlessly difficult or dangerous.

If the time shall hereafter arrive when the number of ferries required between the two cities, and the number of boats to be run thereon, shall be so great, that safe anchorage ground in the river, where they cross, cannot be found, without interrupting the ferries, or rendering passage thereon dangerous, then the enquiry will arise, whether vessels engaged in ordinary navigation must not seek other anchorage; and that enquiry will arise, not as a mere question of abstract private right, it will not be determined out of any especial regard to ferry managers, in their merely private interests, but it will be a question of public interest. At present, it is sufficient to say, that, while the river is a great national highway, and is open to navigation by all, all who navigate it are bound to have respect, not merely to the ordinary rights of others, but to consider the nature of the business of such others, and the exigencies which that business involves.

Without affirming, and, certainly, without denying, the validity of the state and city legislation, designed for the protection of the lives and safety of passengers on the ferries, and intended to facilitate the conduct of business so important not only to both cities, but to the country having business intercourse with those cities, it is obvious, that that legislation rests upon the principles above stated, and those principles are to be recognized and applied, whether such legislation is valid or not.

In the present case, it is shown, that the bark Ellingwood, the vessel of the libellants, bound for the foot of 21st street in the North river, came up from below, in the afternoon of the 6th of December, 1864; and that, instead of going up the North river, to her destination, she came up the East river, and, between five and six o'clock in the afternoon, anchored in the East river, in, or very nearly in, the track of the ferry between Wall street, New York, and Montague street, Brooklyn. The evening was clear, and she was seen and twice successively hailed from the ferry-boats, informed that she was in the track of the ferry, and requested to remove to anchorage ground lower down, out of the way of the ferry-boats. No attention was paid to the request. The ferry-boats succeeded in avoiding her during the evening. But, in the morning, when the ferry-boats resumed their usual trips, a dense fog was over the river, and, notwithstanding the most painstaking vigilance, the most careful lookout, and the constant giving of signals by the ferry-boat, the ferry-boat Exchange came in contact with the bark, doing some damage, for which her owners filed the libel herein. The bark gave no notice of her presence or near neighborhood in the morning, by bell, horn,

or otherwise, and could not be seen from the ferry-boat, until she was so near that the collision was inevitable.

The bark should not have anchored where she did. I do not say that she was in fault in coming into the East river. At the hour when she anchored, it may have been too late to expect safely to enter the slip, or come to the wharf, at 21st street, on the North river, or there may have been some difficulty in finding a suitable and convenient anchorage on the North river side, though no reason has been given, on behalf of the libellants, why she came up into the East river at all. Be the reason what it may, there is an utter failure to show any reason for selecting the place where she did anchor. The bark should have given heed to the requests made by those on the ferry-boat, and, admonished thereby, have changed her anchorage. It is not proved, or even claimed, that this was not entirely practicable. It is not too much to say, that, choosing such a place to anchor, and persisting in lying there, notwithstanding the warning she received, the bark took the risk of any collision with a ferry-boat navigated with ordinary care and caution. It is still more obvious, that she took the risk of a collision, in the on-coming dense fog, which occurred in spite of very special and diligent care and caution on the part of the ferry-boat.

The bark should have given notice of her location, apprising the ferry-boat of their near approach, by bell or fog-horn, in the morning. It it claimed, that, because those navigating the ferry-boat had seen her where she was the evening previous, they were bound to take notice of her location in the morning, and avoid her, notwithstanding her omission in this respect. If the ferry-boat was bound to assume that she remained still at anchor at that place, and that she had not moved, as twice requested, and was not at liberty to infer, from the absence of the sound of bell or horn, that she was no longer there, then it is true that knowledge of her location the previous evening required that the ferry-boat should be more vigilant than, without such knowledge, was required of her; but, that is all. She was not bound to suspend her trips, and it is not shown that she omitted any reasonable precaution to make her passage safely.

Finally, the libellants have failed to show any fault on the part of the ferry-boat. She was not bound, and the court cannot say she was at liberty, in a dense fog, to depart from her usual course. The consequences of her doing so cannot be foreseen. If she had voluntarily done it, and collision with some other vessel properly lying out of such usual course had happened, and injury to her, or to the lives and property she herself carried, had followed, she could not have been justified. The libel was properly dismissed, and the dismissal must be decreed, with the costs of appeal.