## HUGHES v. PENNSYLVANIA R. CO. et al.

(Circuit Court of Appeals, Second Circuit. February 25, 1902.)

No. 88.

**COLLISION—FOG—TUG AND TOW—NEGLIGENCE OF TUG.**

> A tug, having in charge eight canal boats in three tiers, tied them up on reaching a pier in the East river at about 1 a. m., to await a favorable condition of the tide before proceeding further. The night was then clear, and the tug left the tow to engage in other work. At 3 o'clock a fog came on, and later in the morning became very dense. The canal boats, when left, tailed down the river with the ebb tide, but

when the tide rose gradually swung out across stream, and, while lying thus, about 6:30 a. m., a ferryboat collided with one of the canal boats and injured it. When the fog began to rise, the tug was a very short distance from the tow, and had only two light boats in charge, and could have returned to the tow. *Held* negligence on the part of the tug, and that it was liable for the injury.

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here upon appeal by both respondents from a decree of the district court (93 Fed. 510) holding the defendant railway company solely responsible for the damages resulting from a collision between libelant's canal boat F. B. Morris and a ferryboat alleged to be owned by the Pennsylvania Annex. The appeal of the last-named respondent was evidently taken through some oversight, inasmuch as the district court dismissed the libel as to it. It was not argued here, and may be disregarded.

H. G. Ward, for appellants.
Le Roy S. Gove, for appellee.

Before WALLACE, LACOMBE, and TOWNSEND, Circuit Judges.

LACOMBE, Circuit Judge. The facts are as follows: The libelant's canal boat F. B. Morris, loaded with coal, and bound from South Amboy to 138th street, Harlem river, was in tow of the Pennsylvania Railroad Company's tug Media on February 9, 1898. There were eight boats in the tow in three tiers, and the Morris was the outside port boat in the second tier. At about 1 a. m., the tide being then ebb, the tug tied up the flotilla at Pier 5, East river, by fastening the head tier, leaving the tow tailing down the river on the ebb tide. Thereupon the tug left the tow in order to engage in other work, picking up light boats, and towing them down to a stake boat off Liberty Island. It was the intention of the master of the tug to return to the tow after the tide turned, and avail of the flood to take it to its destination. While the tug was thus absent, the tide turned, and in consequence the tow, instead of tailing down stream, gradually swung out across stream, and the Morris, which had been an inshore boat, became outside boat lying out in the river more than the length of the first tier beyond the end of the dock. It was foggy when the tow began to swing outward, and the fog subsequently grew very dense. While lying thus, about 6:30 a. m., the ferryboat Annex No. 5, running around the Battery on her way to Brooklyn, collided with the Morris. The district judge held the ferryboat free from fault, and no appeal challenges the accuracy of that conclusion. The claim against the tug is for negligent towage, for not showing the proper measure of care for the boats in her charge. As to the tying up of the tow at the pier to await favorable tide, it is urged that it is the practice and custom of tugs so to do; that it was what the tow expected would be done; and that it was for the benefit of both parties that during the interval the tug should go about other business, because by thus using all her time it is to be assumed that towing is made cheaper. It is not necessary to discuss these propositions, because, conceding them to be correct, the tug was nevertheless negligent under the facts of this par-

ticular case. When the tow was tied up at 1 a. m., the weather was clear and fine. So long as the tow remained tailing down so as to be close to the ends of the piers, it was in a position of safety. Even after it had swung out into the stream it would probably meet with no misadventure so long as the weather continued clear, so that it could be seen by navigating vessels. But if, while it was thus swung out, it should become shrouded in fog, its position would be perilous. When the tug left the tow at about 1:30 a. m., the night was clear, and the tide was ebb. The only evidence in the record indicates that the tide began to change about half past 3 or 4 in the morning. Whether it turned then or later, the master of the tug knew it would turn, and further knew that, when it did turn, the tow, being fastened only at the head, would inevitably swing out across the stream. The evidence shows that indications of fog began about 3 a. m.; that the fog gradually increased; that at 3:30 it was thicker, but objects could still be seen; that by 4 a. m., or shortly after, it had increased so much as to make navigation dangerous. The tug went off, as was said before, in search of light boats. It found one at 55th street, another somewhere else in the North River, and when it began to get foggy in the North river, the tug, with these two light boats in tow, was about opposite the Pennsylvania ferry at Cortland street. The master thereupon proceeded with the two light boats to the stake boat off Liberty Island. He arrived there about 4 a. m., by which time it was very thick, and getting thicker; so bad that he did not think it safe to run, wherefore he remained at the stake boat (the fog continuing) until he turned in at 7 a. m. When the fog began to rise and thicken, the tug was a very short distance from where it had left the flotilla. It had only two light boats in charge. The weather was still clear enough to navigate with safety. The master knew that the turn of the tide would swing the flotilla out into the stream, and that the fog, should it continue to thicken, would put the boats composing it in a position of peril. He might have tied up the light boats, or have carried them with him, and, returning to Pier 5, East river, have then either tied up the boats so they would not swing, or have expedited the swing till they tailed up stream, or have stood by them and sounded signals, which would have secured their safety. His failure to do so under the circumstances shows a lack of ordinary prudence, which abundantly sustains the charge of negligence in looking after the tow. When the colliding ferryboat was held to be free from fault, the question whether some one or other of the boats in the flotilla should have made her presence known by sound signals of some kind became an academic one, and need not be discussed.

The decree of the district court is affirmed, with interest and costs.