### THE MEDIA.

#### (District Court, S. D. New York. June 8, 1904.)

1. **TOWAGE—SINKING OF TOW AT DOCK—LIABILITY OF TUG.**

A tug, with a flotilla of barges to be brought from South Amboy to New York and vicinity, left one in the evening at a dock or bulkhead at Elizabethtown, N. J., to be called for and taken to her destination later. The weather was then foggy, but the wind light from the southeast. The fog increasing, and a heavy wind from the west coming on, the barge was not called for until the second morning, when she was found to have been injured by a pile in the bottom and afterward sunk. During all the day after she was left a very strong wind blew from the west, reaching a velocity of 50 miles an hour, causing an extraordinarily low tide, nearly three feet lower than the average. Under ordinary conditions the dock was a safe place for the barge. *Held*, that the tug was not chargeable with any breach of duty in so leaving her tow, which was in accordance with custom, and was not liable for the injury, which must be attributed to the unusual weather conditions.

In Admiralty. Suit against tug for injury to tow.

James J. Macklin, for libellant.
Robinson, Biddle & Ward, for claimant.

ADAMS, District Judge. This action was brought by Frank McWilliams, as owner of the barge John Barnes, against the Pennsylvania Railroad Company's steamtug Media, to recover the damages caused

by the barge being left at the Iron Dock of the Central Railroad of New Jersey, at Elizabethport, New Jersey, on the 29th of January, 1903. The tug took a flotilla of boats in tow at South Amboy, bound for New York and vicinity, about 7 o'clock in the morning. Among these boats was the Barnes, laden with 762 tons of coal, bound for Newark, New Jersey, where the railroad company undertook to deliver her. Some fog prevailed and the tow put into Perth Amboy, where the tug Overbrook took charge of it, assisted by the Media. The fog lifting, the tow proceeded through the Kills to the place mentioned, where the Barnes was taken out of the tow by the Media and left, to be subsequently called for and the towage completed, fastened to the said dock, more properly bulkhead, about 7 o'clock P. M., while the remainder of the tow proceeded, but did not get far when the fog settled down again. The Barnes remained at the place it was left and in the early morning of the 31st of January, it was discovered that she was injured through being punctured by a pile, on her starboard side near the dock, from which she subsequently sank. She drew when floating about 10 feet of water and was not entirely submerged when sunk.

At the time the Barnes was left, the wind was light from the southeast. It changed around through the east and south, to the westward and increased in force, so that between 8 and 9 o'clock A. M. of the 30th, it was blowing 18 miles an hour, and subsequently increased to the neighborhood of 50 miles an hour and blew at substantially such a rate through the remainder of the day, and the velocity remained high through the greater portion of the next day. The effect of the wind was to blow the water out of the Kills and off the coast, and cause a tide nearly three feet below the average, which rarely happened.

The following table has been put in evidence:

"Liblt's Ex. 2
March 10/04.
Station: Fort Hamilton, N Y.

| DATE | HIGH WATER | | LOW WATER | | |
|------|------|------|------|------|------|
| 1903 | Time | Height | Time | Height | |
| | h. m. | Feet | h. m. | Feet | Remarks |
| Jan. 29 | 8 10 | 5.24 | 2 18 | 0.09 | The time used at Fort Hamilton |
| " 29 | 20 32 | 5.04 | 14 35 | 0.06 | Tide Station is Eastern Standard |
| " 30 | 9 10 | 5.66 | 2 38 | 0.79 | mean civil time. |
| " 30 | 20 13 | 2.46 | 15 16 | 0.81 | The heights here given are |
| " 31 | 9 23 | 2.79 | 4 16 | 2.49 | the heights above mean low |
| " 31 | 21 43 | 2.77 | 16 00 | 2.34 | water. |

J. G. Spaulding, Mar. 10, 1904."

The libellant alleges fault as follows:

"Fourth: That said damage was owing to the fault, negligence and carelessness of those in control and charge of the said Steamtug 'Media,'
(1) In not placing the said barge in a proper berth where she would be at all times free from damage.

(2) In that said barge was left an unreasonable length of time during the prevalence of the wind which made an insufficient depth of water for said barge to float without resting on the broken spiles and other obstruction along the face of said dock or bulkhead.

(3) In that said steamtug 'Media' placed the said barge at said wharf or dock without permission or authority on the part of the owner or occupant of said dock, as libellant is informed and believes.

(4) That said barge should have been towed to her destination, which the owner of said steamtug agreed to do, without tying her up at said wharf, dock or bulkhead.

(5) In that it was the duty of the said owners of said steamtug or their agents or servants to have protected the said barge from all harm, and to ascertain what character of bottom there was where said barge was placed."

The claimant, in connection with a general denial of the libellant's allegation of negligence and faults, avers that the bulkhead at which the Barnes was placed was a well known and frequently used mooring place for vessels of her kind and description; that the placing of her there while in process of being towed to Newark was in pursuance of the usual and customary method of towing to that place and that during the period from January 29th to 31st, the weather was unsuitable for towing and that as soon as it was safe or proper to remove her, i. e., the 31st, a tug was sent to her for such purpose, when it was discovered that a pile, not attached to any dock, had run through her bottom, causing her to leak so badly that she was not in a condition to navigate.

The testimony sustains the averments of the answer and unless the tug can be regarded as an insurer of the safety of the tow, in view of the time she was left at the bulkhead, there does not seem to be any liability, because it appears that nothing unusual was done in landing the barge at the place where she was injured. The accident was apparently attributable to the extraordinarily low tide, caused by the violent western wind, which could not have been anticipated.

In answer to the libellant's charges in detail, I find:

1. The barge was placed at a proper berth where she would have been free from damage if it had not been for the very low tide caused by the extraordinary violence of the wind.

2. The barge was not left an unreasonable time in view of the fog which prevailed and the difficulty of getting to Newark with a vessel of her draft, except at certain stages of the tide.

3. It is immaterial that permission to use the bulkhead was not received from the owner or occupant. As between the libellant and claimant, the question is, whether proper care was exercised by the tug.

4. This is covered by the remarks under the second charge. The detention at the bulkhead was in the usual course of business, except as affected by the fog and wind.

5. The tug did not become an insurer by using the bulkhead, nor assume the duties of a wharfinger towards the barge.

My attention has been called to numerous authorities, collected by the industry of the libellant's advocate, but a careful examination of them has failed to change the conviction, formed upon the trial, that the libellant had not sustained the burden of establishing that the accident happened through negligence on the part of the tug.

The testimony, on both sides, shows that the leaving of the barge

at Elizabethport was a usual incident of a trip to Newark and what followed could not be anticipated. It was not like leaving a boat in a place subject to danger from a change in the direction of the wind. It has been held in several cases, that on account of the tug failing to stand by and watch out for the safety of its tow, liability should follow, but no case similar to the one in hand has been cited. In Hughes v. Pennsylvania R. Co. (D. C.) 93 Fed. 510, affirmed 113 Fed. 925, 51 C. C. A. 555, for example, the whole tow was left free at one end to swing with the tide and the tug went away to engage in other business. While she was absent, the tow swung with the tide, exposing one of the boats to collision, which subsequently happened with a ferry boat m a fog. The absent tug was held liable, because the danger could have been anticipated and the collision could have been avoided by attention on her part. The difference between such a case and the one under consideration is obvious. Here, there was no danger from leaving the boat, until the extraordinarily low tide developed the presence of the dangerous spile. Many other boats had safely lain during ordinary tides in the same place without injury. They were perhaps of somewhat different build from the Barnes but there was no reason to anticipate danger for her and in fact, there was no danger under usual conditions.

Several of the cases cited were those of boats injured at wharves or docks and turned upon the failure of the owners or occupants to exercise the especial care, which was incumbent upon them by reason of their relations, to ascertain whether the approaches or vicinity were reasonbly safe for the use of vessels authorized to go there. If this tug's duties to the tow should be considered equivalent to those of a wharfinger by reason of the notice given by the owner of the wharf that it should not be used, still there would be no liability, because it does not appear that the wharfinger, assuming an invitation given to use the wharf, could be held in this instance, on account of the extraordinary tide, which was the proximate cause of the accident. I have not been referred to any authority which would impose liability upon a towing vessel under circumstances similar to those disclosed by the testimony here.

Libel dismissed.