## J. Q. ADAMS *v.* NORMAN CAREY

[No. 45, January Term, 1937.]

*Decided March 17th, 1937.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, SHEHAN, and JOHNSON, JJ.

*Philip H. Dorsey, Jr.,* with whom was *S. M. Brandt* on the brief, for the appellant.

*John B. Gray, Jr.,* with whom were *William Aleck Loker* and *John B. Gray & Son* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

On January 10th, 1935, John Quincy Adams owned, and one Winder operated, a ferry boat for the transportation of automobiles and passengers between Solomon's Island in Calvert County and Millstone in St. Mary's County, over the waters of the Patuxent River, in this state.

In plying between those points, ordinarily, the boat was taken over a somewhat tortuous course, which ran across Drum Point Harbor, and near certain oyster ground which had been leased by the State to Bernard Lankford, who subleased a part of it to Norman C. Carey. This ground was located in an area of shallow water known as the "flats," which extended to what was colloquially known as the "ups and downs," where it abruptly shelved into the deeper waters of the channel. A warning beacon is located at the edge of the

deep water about 400 feet from a wharf at Solomon's, referred to as the "steam boat wharf." In making its "normal run" from Millstone Wharf to its dock at Solomon's, the ferry boat crossed Drum Point Harbor, turned into Mill Creek, passed the steamboat wharf, and continued for a run of some six minutes to its dock.

The ferry boat was about 65 feet long, about 20 feet wide on the bottom, drew about 6 feet of water, its propeller was about 36 inches wide, and it had a 60 horse power motor. Carey had planted, he said, at the time of the occurrence described below, about 315 bushels of oysters on the lot which he had leased from Lankford.

At about 3 o'clock in the morning of January 10th, 1935, the ferry boat, in charge of Captain Winder, with a full crew, left the Millstone Wharf for Solomon's Island. The weather at that time was calm, there was little or no wind, the tide was coming in, and there was a heavy fog. Because of the fog, and the low visibility, Winder did not see the beacon as he passed it, miscalculated his course, and ran aground in the shallow water near Carey's oyster ground. At the edge of the channel there was a post with "lattice work" on it, which the steamboat company planted as a guide for boats coming to its wharf. When Winder first saw that post, he reversed his engine, but was unable to stop the way of the boat before it ran aground. When it ran aground one of the crew was in the bow as a lookout, another at the engine, and he was in the pilot house.

After the boat ran aground, Winder tried to clear it by sending it alternately backward and forward, and eventually it did come free. But in the course of those maneuvers, the propeller churned up the sand, and the boat made holes in the bottom, so that as a result Carey's oysters were covered with sand, and a portion of them destroyed. Thereafter Carey brought this action in the Circuit Court for St. Mary's County against Adams to recover the value of the oysters destroyed, on the theory that their destruction was caused by the defendant's negligence. The trial resulted in a verdict and judgment

for the plaintiff, and from that judgment the defendant appealed.

There was in the case evidence which tended to prove, in addition to the facts stated above, these facts, that the oysters were worth about sixty cents a bushel, that the holes made by the boat were about six or eight feet deep, and thirty or forty feet long, that the oysters were at times covered with sand when there was a very strong southeast wind, that there was no such wind that day, and that the propeller did not extend below the keel of the boat.

At the conclusion of the whole case, the plaintiff offered one prayer which was granted, and the defendant seven, of which four were rejected and three conceded. These rulings are the subject of the first and only exception submitted by the record.

The defendant's first prayer, a demurrer to the evidence in the usual form, denied the legal sufficiency of the evidence to show that the plaintiff's loss was caused by any negligence on the part of the defendant. The plaintiff, on the contrary, asserted that the defendant was negligent in these respects: (1) In attempting to make the trip at all under the weather conditions; (2) in so operating the boat that it ran aground; and (3) in attempting to free the boat after it grounded by driving its propeller, instead of waiting for the tide to float the boat, or of procuring a tow to pull it off.

In the order stated, the first question to be considered is whether negligence may be inferred from the fact that the ferry boat started on its trip from Millstone to Solomon's at a time when, due to fog, the visibility was too low to permit those operating it to see objects marking the course, such as the beacon and the post with the lattice work. In dealing with that question, these facts, which are not in dispute, are relevant: The distance between the two points is short, a part of the course is tortuous, while the boat was regularly employed in a ferry service, that trip was a special one, there were from twelve to twenty-five passengers on it, Capt.

Winder, who was in charge of the boat, was the "regular captain," and it may be inferred, familiar with the course.

These facts standing alone are not sufficient to support a finding that the defendant was negligent in attempting to make the trip from Millstone to Solomon's Island under the weather conditions, although such conduct may be considered in determining whether, under the circumstances, the manner in which the ferry boat was managed was consistent with due care.

It is said to be a general rule that: "Where in a river harbor, or narrow channel the weather is so thick that other vessels cannot be seen or heard in time to avoid them, or where the vessel cannot keep her course or know her position, she should not start on her journey, or, if under way, should come to anchor or land as soon as possible. * * *" 11 *C. J.* 1127. But in the United States, ferry boats are an exception to that rule, because as a matter of public necessity they cannot entirely stop making trips in a fog. *Id.; Wright & Cobb Lighterage Co. v. New England Nav. Co.* (D. C.) 189 Fed. 809 (affirmed 204 Fed. 762, 125 C. C. A. 129) ; *The City of Lowell,* 152 Fed. 593, 81 C. C. A. 583 (reversed (D. C.) 139 Fed. 901) ; *The Chicago* (D. C.) 134 Fed. 1013 (reversed on other grounds 146 Fed. 979, 77 C. C. A. 225) ; *Hughes v. Pennsylvania R. Co.* (D. C.) 93 Fed. 510 (affirmed 113 Fed. 925, 51 C. C. A. 555) ; *The Whitehall* (D. C.) 68 Fed. 1022; *The Orange* (D. C.) 46 Fed. 408; *The Exchange,* 10 Blatchf. 168, 8 Fed. Cas. p. 933, No. 4,593; *The Hudson,* 5 Ben. 206, 12 Fed. Cas. p. 803, No. 6,829; *Hoffman v. Brooklyn Union Ferry Co.,* 68 N. Y. 385 (affirming 4 Hun, 274).

So it was held in *Wright & Cobb Lighterage Co. v. New England Nav. Co.,* (D. C.) 189 Fed. 809, 814, where a ferry boat collided in a dense fog with a car float moored to a pier in New York Harbor, that no fault could be attributed to the ferry boat merely because it operated in the fog, since public interest required that such boats make "their regular trips even in very thick fogs."

In *Hoffman v. Union Ferry Co.*, 68 N. Y. 385, 394, in considering the duty of the pilot of proceeding or laying to in a fog, the court said: "It is insisted by the appellant that the Baltic, as a ferry-boat, was exempt from this rule. I do not so understand the law. The running of a ferry-boat upon her regular trips is important to the public, and her efforts to serve the public should be regarded with favor. Negligence would not readily, or except upon a clear showing, be imputed to her in endeavoring to make her trips in the dark, or through a fog, but she is not exempt from any of the positive rules which are applicable to all vessels except when especially exempted by statute. In *The Sylph, supra* [4 Blatchf. 24, Fed. Cas. 13,711] Judge Nelson does not discriminate in favor of the ferry-boat. He dismissed the libel, because both vessels were navigating in a dense fog, but he expressly says, that had the other vessel been at anchor he would have charged the Sylph, which was held to be a ferry-boat, with the loss. It may be, and it is not necessary to hold otherwise, that a ferry-boat would be justified in leaving her dock upon her regular trips, and moving cautiously in her usual course, when it would be improper and negligent for a vessel in other service to do so."

Considering the frequency with which fogs occur in certain areas, and the serious interruption of water transportation which would result, if persons charged with the operation of a ferry service were required to suspend operations whenever a fog occurred, the mere act of continuing to operate the ferry under fog conditions should not be characterized as negligence *per se*, if it was operated prudently, cautiously, and carefully, with due regard to the safety of the passengers, and so as to avoid as far as possible injury or damage to the person or the property of others.

Coming to the second point, the evidence shows that the boat proceeded at greatly reduced speed, that a constant lookout was maintained, that as soon as the post indicating the limit of the channel became visible the

engine was reversed, nor was there the slightest evidence of any want of care in the manner in which it was operated, unless the negligence may be inferred from the mere fact that it ran aground. But, assuming that it was not negligent to make the trip at all under the conditions, it is manifest that no such inference should be drawn. The fog and the tortuous character of the channel made such a mishap possible, notwithstanding every precaution short of laying to had been taken to avoid it. The boat was plying over navigable waters, the master was under a duty to safeguard his passengers and to avoid collision with other craft navigating the same waters, and if, in the exercise of his right to navigate, he elected to go ahead, as safer than laying to, and his boat unavoidably, as the result of an accident unmixed with negligence, damaged private property lying under water adjacent to the usual and ordinary course, his conduct should not be characterized as negligence. So, it is stated in *Farnham on Waters,* sec. 33, in considering the liability of the owner of a vessel for damage to property on the water or along the shore. "But the shore and the structures located thereon are subject to the dangers incident to the right of navigation, such as the wash from the reasonable propelling of vessels in the stream, and the liability to receive injury by reason of their location from accidents resulting in moving craft along the waterway." 24 *R. C. L.* 1236, 1237.

(3) Finally, the appellee suggests that the action of the master of the vessel in attempting to free it from the sand bank by its own power was not only negligent, but that a natural consequence of it was to cover the oyster bed with sand, and to damage or destroy the oysters planted there.

There may exist in respect to land lying within the territorial limits of one of the states of the United States of America, which are accessible from a state other than that in which they lie, and covered by navigable water, three groups of rights, possessed by distinct bodies, natural or corporate, one held by the United States, one

by the state, and one by private persons holding through and from the state or the United States.

The United States, when it elects to exercise it, has complete and paramount control over all navigable waters within its boundaries, and of the land beneath such waters, in so far as its use or improvement may affect navigation. The State owns the land lying beneath such waters within its territorial limits, subject, however, to that paramount right of control, and the citizen may acquire mediately or immediately from the State, also subject to the paramount jurisdiction and control of the federal government, proprietary rights in such lands. *Farnham on Waters*, secs. 12, 13, 14, 10, 10a, 11; 45 *C. J.* 419, 537, 538-540; *Sollers v. Sollers*, 77 Md. 148, 542, 544, 26 A. 188; *Linthicum v. Shipley*, 140 Md. 96, 116 A. 871.

The State might therefore lease land covered by tidal waters to private persons for the purpose of oyster culture who would hold it as any other property might be held, but subject to the condition that no use might be made of it which would interfere with the navigability of the water that flowed over it. In this case it did lease the land affected by this suit to the plaintiff's lessor, and it does not appear that his use of it in any way interfered with the navigability of the water flowing over it. He was therefore entitled to hold and enjoy it in security, free from any wanton or negligent interference with that right. As a corollary of that proposition, others, having notice of the location and character of his property, were under a duty to exercise reasonable care and prudence to avoid damage to it.

The appellant suggests that there is no evidence that the master of the boat had any knowledge that he was "on the oyster beds" of the appellee. That suggestion is not consistent with the record. Carey, the appellee, said that he "staked off in blocks the land he rented from Mr. Lankford," and it appeared from Winder's testimony that he had crossed many times on that route, and it may well have been inferred that, as an experienced navigator, familiar with those waters, who had many

times passed in the immediate vicinity of the appellee's land, that he had seen the stakes which marked its location.

The dimensions of the lot were forty by one hundred feet, and ran to the deep water. After the boat had been freed, Carey went on the oyster ground, and, he said, found a hole six feet deep and "thirty or forty" feet long, where his oysters were, and the oysters covered with sand. It is consistent with the evidence that those conditions were caused by the efforts of the master to free the boat by driving it alternately forward and backward over the sand on or adjacent to appellee's oyster bed.

Whether that operation constituted negligence was, under the circumstances, a question of fact for the jury, and not a question of law for the court. It appeared that Winder could have followed any one of three courses, he could have waited for the tide which was coming in and "half high" to float him off, he could have sent for a tow, or he could have tried to free it by its own power. It may be assumed that he knew that the latter course would churn up the sand so that it would settle in injurious quantities on the oyster bed, and that, in driving the boat farther forward, it might actually invade the bed and mash down the oysters that might be planted there. His excuse for not waiting for the tide to float the boat off was that he felt he should get the passengers off to the ferry landing as soon as he could because if a wind came up it might tear up the boat. But he admitted that there was no wind, nor any indication that there might be wind, there had been none that night, and there was none during the rest of the day.

He was under a duty to exercise reasonable care to avoid damage to the appellee's property, and it cannot be said as a matter of law that his conduct in voluntarily selecting a method of freeing the boat which he must have known might damage appellee's property did not violate that duty, when a different method, although attended by a greater delay, would have had no such effect.

In *Cain v. Simonson* (Ala. Sup.) 39 So. 571, 3 L. R. A. (N. S.) 205, it was held that: "A riparian owner who has planted oysters in the tidal water adjoining his land under license from the State may enjoin other riparian owners from sailing across his beds in going to and from their own, where such acts would do him irreparable injury, and there is a marked channel which is adequate for the purpose, by the use of which no injury would be done." In *Tolchester v. Brooke*, 7 Q. B. 339, in speaking of the passage of a ship over an oyster bed, the court said: "If, then, the defendant could not have done this purposely and knowingly, the same principle shews that he was bound to use due care and skill in the navigation of his vessel, so as not to do it unwittingly by want of these. As a general rule of law, every one, in the conduct of that which may be harmful to others if misconducted, is bound to the use of due care and skill; and the wrong doer is not without the pale of the law for this purpose." 115 Eng. Rep. p. 532.

In *Farnham on Waters*, sec. 33a, it is said: "The right to fish and the right to navigate are both natural rights. One cannot be exercised to the exclusion of the other, but the manner of exercising the right to fish is such that a temporary suspension of it will not ordinarily cause perceptible loss, while it might not be possible to suspend the right of navigation to await the convenience of the fishing right. Therefore, the right of fishery is required to give way, and permanent fixtures cannot be placed in the stream for the purpose of fishing which will interfere with the rights of navigation. But notwithstanding the fact that the vessel has the right of way it cannot exercise its rights to inflict unnecessary and wanton injury upon the fisherman. * * * But if the vessel goes out of its way to injure fishing nets, or if it could have avoided them without unreasonable interfering with its own movements, the owner of the vessel will be liable." See, also, *Id.*, sec. 404; 27 R. C. L. 1322. It follows that, for the reasons stated, the defendant's first or demurrer prayer was properly rejected.

His second prayer, which was rejected, was fully covered by his conceded prayers, except that they did not include the statement, found in it, that "the mere happening of the accident * * * raises no presumption of negligence. * * *" While the prayer was proper, and should have been granted, it is incredible that the omission of a matter of such obvious and commonplace knowledge could have affected the verdict of the jury, and the error, if it can be so regarded, is certainly not reversible.

His sixth prayer, also rejected, was covered by granted prayers, except that it contained the statement, omitted from them, "The defendant prays the court to instruct the jury that the land lying under the waters of the Patuxent River and leased by the plaintiff from the Conservation Department of Maryland for the purpose of oyster culture is held by the plaintiff subject to the paramount right of navigation." That statement was undoubtedly good law, and it was also true that the damage complained of was caused by the navigation of the boat. If the jury found that it was a natural and proper incident of its navigation, and involved no negligence on the part of the defendant, their verdict should have been for the defendant. Unless they were so informed, the jury may not have known that the right of navigation was paramount to the plaintiff's right of fishery, and the defendant was entitled to have them instructed as to that very important element of his defense. There was therefore injurious error in the refusal of that prayer, which was not cured by the action of the court on the other prayers.

The plaintiff's prayer which was granted was faulty, because it failed to require the jury to find that defendant or his servants operating the ferry boat had or should have had knowledge of the fact that oysters were or might be planted in the area which might be affected by the operation of the boat, or that its operation could inflict damages upon the property of another. If they neither knew, nor had reason to know, that fact, the defendant could not well be charged with negligence for

damage to the oysters caused by the operation of the boat. It is true that the absence of intent is essential to the legal conception of negligence. If the tortious act is intentional, it may be willful, wanton, or fraudulent, but not negligent (45 *C. J.* 636), but before one can be charged with the violation of a duty, he must have knowledge, actual or constructive, that there is a duty for him to perform (*Id.* 651), so that, as stated in the work last cited: "As negligence necessarily involves a violation or disregard of some duty which is known to the person charged therewith, it follows that knowledge of the facts out of which the duty arises is an essential element for consideration in determining whether one has exercised reasonable care or has been guilty of negligence. Accordingly, the general rule is that, in order that an act or omission may be regarded as negligent, the person charged therewith must have knowledge that such act or omission involved danger to another or that there was some defect or danger in the instrumentality or property causing the injury, or must be chargeable with such knowledge." 20 *R. C. L.*, "Negligence," secs. 8, 9; *R. C. L.* Suppl., "Negligence," notes to secs. 8 and 9.

Certainly the defendant ought not to be charged with negligently damaging the plaintiff's property, unless he knew or should have known that there was property of some kind, either the plaintiff's or another's, near enough to the place where the boat ran aground to be damaged by his efforts to free it. And since a prayer going to a recovery, which fails to instruct the jury that before they can render a verdict in accordance with its mandate they must first find every fact essential to that result, is defective (*Blumenthal & Bickart v. May Advertising Co.*, 127 Md. 277, 284, 96 A. 434; *Munroe v. Woodruff*, 17 Md. 159, 165), the plaintiff's prayer should have been refused. Because of these errors, it is necessary to reverse the judgment and remand the case for a new trial.

*Judgment reversed and case remanded for a new trial with costs to the appellant.*