## MALLERY TOY ET AL. *v.* ATLANTIC GULF & PACIFIC COMPANY.

[No. 7, January Term, 1939.]

*Decided February 22nd, 1939.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, JOHNSON, and DELAPLAINE, JJ.

*Omar D. Crothers, Jr.,* and *W. Hamilton Whiteford,* with whom was *Henry A. Warburton* on the brief, for the appellants.

*Edward D. E. Rollins* and *Thomas J. Keating, Jr.,* with whom was *James T. Mullin* on the brief, for the appellee.

PARKE, J., delivered the opinion of the Court.

The effect of the pleadings in this case made it an action sounding in negligence whereby the defendant was chargeable with the deposit of great quantities of earth in navigable water, so that a pond for carp on the land of the plaintiffs, and the navigation of an approach to the plaintiffs' premises, were averred to be destroyed, so that the value of the plaintiffs' land was greatly diminished. At the close of the testimony on the part of the plaintiffs, the defendant offered no evidence, but submitted a prayer to take the case from the jury on the ground of the legal insufficiency of the testimony to entitle the plaintiffs to recover. The court granted this prayer; and, pursuant to its instruction, the jury returned a verdict for the defendant. It is from the judgment on this verdict that the plaintiffs have appealed. The principal error assigned is the ruling on this prayer. The contention is that the court erred in declining to apply either the doctrine of *res ipsa loquitur,* or the principle of liability without fault, in support of the plaintiffs' testimony and right of action. In the view here taken of the case, it becomes unnecessary to discuss the relatively unimportant exceptions to rulings on the testimony.

The plaintiffs are the owners of a tract of land on the west side of Back Creek. The property was bought by them some years ago. A ravine led down to the shore of Back Creek, whose tidal water spread over the bottom of this ravine. For the purpose of providing carp for the market, a dam was made by building a breast across the ravine and scooping out to a greater depth the bottom, so that the tide water of Back Creek would naturally fill the dam half of its depth, and the flow of water from

springs at the head of the dam would raise the impounded water to the level of the breast. In this pond, the carp were kept until they had grown to be of saleable size, when they were hauled away over a roadway from the land to a public thoroughfare. The tide water of Back Creek was let in and out of the pond by a weir constructed in the breast of the dam; and from the point of this weir Back Creek was navigable at high or low tide in small power or row boats with a maximum draught of about two and one-half feet. The chief use of the waterway to the plaintiffs was in the transportation by boat of carp to the premises, and as an outlet and inlet to the deeper waters of the river and Chesapeake Bay. The tides would frequently rise above the top of the breast and overflow the pond. The testimony disclosed that the land of the plaintiffs embraced four contiguous parcels, and three of these were separately acquired and held by the husband in severalty, and the fourth was likewise an independent purchase, but it was conveyed to the husband and wife as tenants by the entireties, and is so held by them. The pond for carp is built upon the first parcel bought and the title for this land is in the husband in severalty. It follows that the alleged wrongs relate wholly to the husband's property, in which the wife had her marital interests.

The injury inflicted is the result of public work of the Federal Government in connection with the navigable waters of the United States known as the Chesapeake and Delaware Canal, which is an inland inter-state sea level navigable waterway extending from a point on the Delaware River westward about fourteen miles to Chesapeake City, Maryland, on Back Creek and thence down Back Creek about five miles to Elk River, and thence down Elk River to the Chesapeake Bay. See *Perrine v. Chesapeake & Delaware Canal Co.*, 9 How. 172, 13 L. Ed. 92. In order to maintain the required depth of the canal frequent and extensive dredging is necessary. The method used was to dredge the material from the canal way by hydraulic machines, and to

remove the material by its flow through a movable pipe line, at whose outlet the material, in a mixture of silt, earth, and water, would be disposed of by deposit in a fluid state upon governmentally supplied or approved places. The effluent would spread out, and the water would drain away, and escape through sluices and channels provided, and the residue of mud would remain to form fast land. The Federal Government had provided along the shore of Back Creek and across from plaintiffs' land a large disposal area for this purpose. As a result of repeated dredging of the canal and successive deposits of material, the fast land had been raised high above the water level along the west shore of Back Creek, so that the Federal Government had constructed an embankment to confine the excavated material. The height of this embankment at the shore line was thirty-five feet above mean low tide. The surface of the fill over the area for the disposal of the dredged material was uneven, but opposite the plaintiffs' property it was over seven or eight feet below the top of the embankment when the defendant began its dredging operations on October 7th, 1935. At that time there were two other dredging companies at work on the canal, but the formation of heavy ice so interfered with their operations that by the middle of December both had quit. The defendant, however, continued.

Before the defendant began to dredge it made an inspection of the embankment which the Federal Government had built. The embankment was found to be in excellent condition and twice the structural strength that would be built for the fill to be made. The existing fill of fast earth had been made by former deposits of material which had been excavated from the canal under government direction and control, and there was nothing to indicate that the embankment was insecure or that its construction was defective in design or material. At the toe of the embankment, a concrete highway had been constructed by the State Roads Commission of Maryland. It had been there for four or five years, and was in a good

state of repair. The engineers of the government in charge of the improvement directed the defendant to deposit the material in that section of the provided area which was opposite the land of the plaintiffs and near the embankment. Under the supervision of these engineers, the defendant re-enforced by manual labor the embankment by sand bagging and filling in with earth, so that the width of the embankment was increased by from twenty-five to fifty feet to a distance of from seven or eight feet below the level of the top of the original embankment. After this reinforcement had been made two or three hundred feet in advance of the position of the dredge at work in the canal, the defendant was instructed to deposit the material in the area so prepared, and the work was carried on in the usual manner until near 7 o'clock on the evening of January 14th, 1936.

Before this date the deposit of fixed earth against the existing embankment in this section of the area of disposal had been raised to a level of from four to five feet below the top of the embankment. The outlet of the line of pipe was from 800 to 1000 feet away from the embankment, and its discharge emptied upon the ground where the effluent spread out and was allowed to stand confined, so that the solid matter would gradually settle to become fast earth, while the water, as it cleared, was drawn off from the top through spillways and flumes and thence flowed into a ditch at a point approximately 1200 feet from the section of the embankment where the accident occurred. The ditch was government property and in it the discharge of water flowed into Back Creek. The spillways and flumes were erected by the Government, but, during the period of its contract, the defendant was charged with their maintenance. When the contractor began its undertaking, it doubled the structural strength of the spillways and they were thus made capable of sustaining whatever strain might be imposed. With the adequate equipment all in order and so maintained, and the discharge of the dredged material and the flow of water both so controlled and directed as not to affect the em-

bankment which moved out, the work of dredging proceeded without any testimony offered of negligence in construction or operation for which the defendant was responsible.

The contract was to dredge approximately 3,149,700 cubic yards of material in the Canal between Bethel and Chesapeake City, which was over a mile, and the area provided by the Government for the deposit of this material between these points was estimated in the testimony to be from 6000 to 8000 feet in width. The work was carried on under governmental control and in accordance with definite specifications. The contract required the material to be transported and deposited at such places within the disposal areas which the United States had provided, or which the contractor could provide, and the contractor agreed to construct and maintain all embankments necessary, in the opinion of the Government's representative, for confining and grading the material, with necessary sluices and drain ditches. The contractor further agreed to be responsible for all damages to persons or property that might occur as a result of his fault or negligence in connection with the prosecution of the work.

The disposal area used by the contractor was provided by the Government. It does not appear whether the footway or base of the embankment was natural or artificial. It was one whose surface had been raised by the accumulation of material deposited by former dredging operations with which the defendant is not shown to have had any participation. The testimony is that, before the happening of the injury compained of, approximately 1,000,000 cubic yards of material had been dredged and deposited in the whole area between the place of the break in the embankment and Bethel, which is a distance of about a mile. During the progress of the work, it was under governmental control and inspection. The representatives of the United States to perform these functions were an inspector, a resident engineer, and the principal engineer in charge of dredging. The defendant kept there a superintendent in charge of its work, and a

watchman who, for protection, patrolled the embankment every half hour. There is no suggestion that these officers of the United States and of the defendant were, at any time, negligent or failed in the performance of any duty in respect of the embankment. On the day of the injury all the officers named were engaged in the performance of their duties of inspection, supervision, and control. They had all been at the embankment. The superintendent was there at least twice and found the embankment in excellent condition, and saw no indication of weakness. He was there the last time about two hours before the work stopped.

Three or four minutes after the pumping ceased, between half past six and seven on the evening of January 14th, 1936, a section of the embankment, between 150 and 200 feet in length, moved out, and, carrying with it 160 feet of the concrete highway at its toe, the entire mass slid into the waters of Back Creek, and broke and thrust into a gorge the ice which covered the creek with a thickness of twelve inches.

The premises of the plaintiffs were not invaded, as the plaintiffs did not prove any title below the high water mark (Acts of 1862, ch. 129; Code, art. 54, sec. 48; *Smoot Sand Co. v. Columbia Granite Corp.*, 146 Md. 384, 388, 126 A. 91; *Linthicum v. Shipley*, 140 Md. 96, 116 A. 871; *Sollers v. Sollers*, 77 Md. 148, 152, 26 A. 188; *Hess v. Muir*, 65 Md. 586, 607, 5 A. 540, 6 A. 673; *Day v. Day*, 22 Md. 530; *Browne v. Kennedy*, 5 H. & J. 195, 203; Emergency Relief Appropriation Act of 1935, approved April 8th, 1935, ch. 48, 49 Stat. 115; see *Adams v. Carey*, 172 Md. 173, 182, 190 A. 815), but the mass precipitated into the creek so filled its channel and bottom that the navigation of which it was susceptible was destroyed, except at extremely high tide, and the plaintiffs were consequently deprived of their former access to the property and dam by small row or power driven boats of light draft; and the filling of the channel also prevented the efficient operation of the weir in letting water in and out of the dam for the carp. The injuries sustained were,

therefore, not direct, and, so, not in trespass, but were indirect, and, so, consequential, and recoverable, if at all, in an action on the case.

The navigability of Back Creek is restricted near the land in question by a low closed causeway which the Government has built across the stream. In addition, the channel did not float any but small boats of light draught. The canal afforded the floatage for the navigation between the waters of the Chesapeake Bay and the Delaware River of the vessels which ply between the naturally navigable waters at either end of the canal. Nevertheless, in the bed of the creek the water regularly rises and falls with the tides and, therefore, the stream is within tidewater, and although its capacity of useful floatage is limited by the depth of the channel of the creek in front of the plaintiffs' shore, nevertheless the riparian proprietor, although having no title superior to the public below the high water mark, was entitled to enjoy, along with the public, such floatage as the shoal water would provide until its status as a highway would cease from natural causes or by action of the State, when not in conflict with a federal dedication. *Economy Light etc. Co. v. United States*, 256 U. S. 113, 41 S. Ct. 409, 65 L. Ed. 847; *Rex v. Montague*, 4 B. & C. 598, 602, 107 Eng. Reprint, 1183; *Havre de Grace v. Harlow*, 129 Md. 265, 278, 98 A. 852; *Charlestown v. Middlesex County*, 3 Metc. (Mass.) 202, 203; *People v. Vanderbilt*, 26 N. Y. 287.

To the extent of its public use in the transportation by boat of person and property, the channel of Back Creek was a highway by water, although it was not actually adapted for passage by any but small craft, such as row boats and small launches, but to that extent it continued to serve a limited public purpose while its waters in the canal bore the vessels engaged in general commerce and transportation. *Havre de Grace v. Harlow*, 129 Md. 265, 278, 98 A. 852; *Sollers v. Sollers*, 77 Md. 148, 26 A. 188; *United States v. Holt State Bank*, 270 U. S. 49, 46 S. Ct. 197, 70 L. Ed. 465; *United States v. Montello*, 20 Wall. 430, 22 L. Ed. 391; *Rex v. Smith*, 2 Dougl. 441, 99 Eng.

Reprint 283; *Peyroux v. Howard,* 7 Pet. 324, 8 L. Ed. 700, Fed. Cas. No. 11,207; *People v. Tibbetts,* 19 N. Y. 523; *Attorney General v. Woods,* 108 Mass. 436, 439; *People v. Canal Appraisers,* 33 N. Y. 461; *Sim E Bak v. Ang Yong Huat* [1923] A. C. 429; *Walsh v. Hopkins,* 22 R. I. 418, 48 A. 390.

The deposit of earth and debris in the channel of Back Creek so that it would obstruct, impede, or destroy the accustomed use of the channel as a highway by water would be unlawful, and a riparian owner who has sustained a particular and special injury, in contrast with that sustained by the public generally, as a direct result of the deposit, may maintain an action to recover damages therefor against the wrongdoer. In the instant case the testimony tends to show that the slide of the embankment so filled the channel that its use as a waterway was destroyed. The special injury sustained by the plaintiffs was that the profitable business of impounding carp in the pond, and preparing them for the market and their sale, depended for the operation and financial success upon the power to raise and lower the level of the water in the pond by the regulated flow of the tidal waters in and out of the pond through a weir in its breast, and the ability to stock the pond with carp by bringing them in tow in live boxes, after having caught them in the confluent waters of Back Creek, Elk River and Sassafras River. The filling of the channel raised the level of the bed of the creek so high that the depth of the water in the pond could not be regulated, and rendered the property inaccessible by water. The destruction of these advantages greatly diminished in value the property of the plaintiffs, and was the cause of a particular and special injury for which an action will lie. *Garitee v. Baltimore,* 53 Md. 422, 436-440; *Lepire v. Klenk,* 180 Mich. 481, 147 N. W. 503; *Morris v. Graham,* 16 Wash. 343, 47 P. 752; *Bissell Chilled Plow Works. v. South Bend Mfg. Co.,* 64 Ind. App. 1, 111 N. E. 932, 939; *Lansing v. Smith,* 4 Wend., N. Y., 9, 31, 32; *Barnes v. Midland R. Terminal Co.,* 193 N. Y. 378, 85 N. E. 1093, 1096; *Tuell v. Marion,*

110 Me. 460, 86 A. 980, 981, 982; *Smart v. Aroostook Lumber Co.*, 103 Me. 37, 68 A. 527, 532, 533; *Home for Aged Women v. Comm.*, 202 Mass. 422, 89 N. E. 124, 126; *Hershey v. H. S. Kerbaugh*, 242 Pa. 227, 88 A. 1009; *Rose v. Miles*, 4 M. & S. 101, 105 Eng. Reprint 773; *Ratte v. Booth*, 11 Ont. 491, affd. 15 App. Cas. 188.

The action brought is not in trespass, nor is it for nuisance, but for negligence. The mere proof of particular and special damage is not enough to give a right of action. Unless the injury and wrongful act constituting or causing the damage co-exist, the essentials for a recovery are not present. The mere happening of the accident does not show negligence. The defendant in the instant case is a contractor in the occupancy of government property, where it is lawfully engaged in the use of the premises for an ordinary purpose and in a customary manner, pursuant to the terms of his contract with the Federal Government. The land of the plaintiffs lies across the width of Back Creek from the premises so temporarily occupied by the defendant as a contractor, and the channel of the creek runs along the eastern shore of the bed of the stream, parallel with the adjacent concrete state highway, until it is opposite the land of the plaintiffs, when it turns and flows westward to their shore. The defendant accordingly is not liable to an action for negligence unless there is a failure to take reasonable care on its part. The plaintiffs do not contend that any testimony has been offered of a failure of the defendant to take reasonable care on its part, but maintain that the testimony is sufficient to prove a cause of action by invoking the aid either of the doctrine of *res ipsa loquitur*, or of the theory that the case is one of liability without fault.

The defendant corporation was employed to dredge, remove, and deposit the material excavated under the immediate supervision and control of the engineers of the Government at designated places on federal property in accordance with prescribed specifications and in a manner and by methods fixed by these engineers. There is not

a particle of evidence that the defendant failed to do the work and to fulfil its obligations in accordance with the standards set by the engineers in charge and the terms of its contract. *Choppin v. Lousiana Levee Company*, 30 La. Ann. 345.

There is neither breach of contract nor negligence shown, nor is it possible for the plaintiff to indicate any negligent act of the defendant, its agents and servants. The testimony is all on the part of the plaintiffs, and by their own witnesses it affirmatively appears, without conflict or contradiction, that the work was carried on with the care and diligence to be expected of men of ordinary prudence and capacity engaged in their own behalf in a similar undertaking under like circumstances. No one saw the section of the embankment slide out, but, half an hour before it did, the watchman had patrolled the embankment, and a short while before the defendant's superintendent and the Government's inspectors and engineers had been at the point of the disaster and none had observed any defect or indication of weakness. None knew of any danger and none had any reason to anticipate the embankment going out. Reasonable care, skill, and precaution required of the defendant nothing more than was shown to have been done by its agents and servants. The area for the deposit of the material dredged was the property of the Government, which was responsible for its condition at the time the work began. What was done and when it was done by the defendant was under the supervision and control of the Government. It was, therefore, authorized. It was not negligent, since the defendant neither saw nor knew nor was it put on notice of any weakness or instability in the embankment, but had every reason to rely with confidence upon its apparent security by reason of the expert qualifications of the Government's engineers in charge, and the length of time the embankment had held its form and position. The record, furthermore, admittedly does not disclose a single fault for which the defendant was responsible after it began to dredge, nor does it appear that the disposal of

the material and its deposit on the area appropriated was in any degree responsible for the breaking away of the embankment.

The doctrine of *res ipsa loquitur* only applies when the facts established are such that they are so clear and unambiguous that the proper and natural inference immediately arises from them that the injury complained of was caused by the defendant's negligence. It does not apply in the instant case because the testimony offered negatives any inference that the injury was caused by any fault of the defendant. From the nature of things there is no probability that the slide was due to the defendant's lack of reasonable care and diligence. The premises and the surrounding circumstances were not under the defendant's exclusive control. Its occupancy was for a specific purpose, and its possession and dominion were limited to this purpose, while its work was performed under the supervision and control of the Government's experts. There was nothing to indicate to the defendant any weakness or instability in the existing embankment, which had been made through the course of preceding years under the control of the federal engineers. A fill of earth becomes stable as its slopes assume a familiar angle of immobility. Apparently it was secure and fast. It did not go out at the top but at the base, carrying the concrete highway at the toe of the embankment. Whatever caused it to break away was undiscovered and remains unknown. The fact that the cause remains unknown, after all the circumstances within the knowledge of the witnesses are in evidence, does not give occasion to impute negligence to the defendant through the aid of the doctrine of *res ipsa loquitur*. The imputation of negligence is not allowed unless the facts and circumstances show that the injury would not have happened in the natural course of things, if it had not been for the negligence of the defendant. So the conditions for the invocation of the doctrine are that the facts already established are such that there is a duty on the defendant to exercise care, and that the injury of which

complaint is made is the result of negligence, and that the thing or condition which inflicted the injury was under the management and control of the defendant or his servants, and that what caused the injury was such as, in the ordinary course of things, does not happen, if those who have management and control use proper care and diligence.

In this case these necessary conditions for the application of the doctrine of *res ipsa loquitur* do not exist. In the first place, the defendant was not and had not been wholly in the possession and control of the disposal area and embankment, and it did not know, nor did it have a much superior opportunity to ascertain and prove, the facts with reference to the embankment's unexpected slip. Nor can it be argued that this movement would not ordinarily have happened if the defendant had used proper care and diligence, since the defendant had no part in the removal and deposit of the material dredged on the area provided for its disposal, and the building of the embankment to the height of over thirty feet above mean low water before the defendant began to dredge, and, so, was in nowise responsible for the care and skill with which these things were done. Furthermore, the defendant had no warning of the disaster. It neither knew nor was it shown that, in the exercise of reasonable care, prudence, and diligence, it should have known of any defective or dangerous condition of the embankment or its foundation. And, finally, there is the greater probability that the subsidence of the embankment—if due to negligence rather than to some natural force, erosion, or burrowing animal working silently and secretly to undermine the base of the embankment—was attributable to some latent fault in the work of those earlier engaged in dredging and making the deposits on the premises. *Klan v. Security Motors*, 164 Md. 198, 164 A. 235; *Frenkil v. Johnson*, 175 Md. 592, 3 A. 2nd 479; see *Curstairs v. Taylor*, 1871, L. R. 6 Ex. 217.

It must, therefore, be concluded that the doctrine of *res ipsa loquitur* does not apply, and, in anticipation of

that conclusion, the plaintiffs put forward the doctrine of liability without fault in support of their right of action. The plaintiff relies upon the doctrine laid down in the case of *Rylands v. Fletcher*, 1866, L. R. 1 Ex. 265, 279, affd. 1868, L. R. 3 H. L. 330: "that the true rule of law is that the person who, for his own purposes, brings in his lands and collects and keeps there anything likely to do mischief if it escapes must keep it in at his peril; and if he does not do so, is *prima facie* answerable for all the damage which is the natural consequence of its escape. He can excuse himself by showing that the escape was owing to the plaintiff's default, or perhaps that the escape was the consequence of *vis major* or the act of God." The facts of this important case are few and definite. The plaintiff had leased certain mines whose coal was obtained by underground shafts. The defendant was the owner of a mill on the adjoining land and there built a reservoir in whose construction he employed competent architects, engineers, and contractors. The reservoir was built over abandoned vertical coal mining shafts, which, through other old and disused passages, communicated with the adjacent and underlying mines of the plaintiff. The defendant did not know of the underground communication. After the reservoir was filled, the water escaped into and down the vertical shafts and found its way through the old passages into the plaintiff's mines, which were thereby flooded and damaged. The defendant was clearly guilty of negligence. The reservoir was built over an abandoned mining shaft without taking the precaution of finding where the shaft led, or making a sufficient foundation to hold the water. The force contained in water confined and under pressure is readily calculable, and the strength of the bottom to hold a given depth and quantity of water is a problem within the range of a competent engineer's knowledge. The failure to provide the reservoir with an adequate foundation made the defendant guilty of negligence, but the court held him liable without reference to negligence. The measure of duty thus imposed on the occupier of premises made him

practically an insurer of his neighbors from such damage, and neither the absence of negligence on the part of the occupier nor the precaution taken was material to his liability. If carried to its logical consequences, the rule would impose grievous burdens as incident to the ownership of land, and therefore the courts have strictly limited the application of the rule. The basic concept underlying the rule is that a person who elects to keep or bring upon his land something which exposes the adjacent land or its owner or occupant to an added danger should be obliged to prevent its doing damage. So, it follows that if the escape be of oil, gas, electricity, explosives, sewage or water artificially accumulated and stored and damage is done to an adjacent property, the occupier is within the rule. In these instances the occupier was not using the land in the common and natural way, and had artificially produced the potential danger whose presence and continuation may well be attributable to negligence, according to the relative circumstances, rather than to the doctrine of liability without fault. *Selected Essays on Law of Torts* (Thayer), pp. 598-613; *Brennan Construction Co. v. Cumberland*, 29 App. D. C. 554, reported and annotated in 15 L. R. A., N. S., 535-549, 10 Ann. Cas. 865; *Pollock on Torts* (8th Ed.), pp. 488, 494.

Even by the rule of *Rylands v. Fletcher, supra,* the occupier is not under an absolute liability for the escape of things which he did not bring or amass on the land occupied. Nor is he so liable when the escape of the dangerous thing was caused by the act of a stranger or by agencies over which the occupier had no control. To bring the defendant within the doctrine of *Rylands v. Fletcher, supra,* it is necessary that the defendant be the owner, tenant, or an occupier of the land in the sense that his occupancy is possession taken for the purpose of exercising control of the land. Here the defendant is merely a corporation carrying on the business of dredging on the property of the Federal Government pursuant to the undertakings of a contract. In no sense has it any right of ownership or control of the site of the under-

taking. The defendant is temporarily there as a business licensee or contractor to do an authorized public work, which is on government land, under federal supervision and control. Again, the dredging of the canal and the disposal of the material is an authorized governmental enterprise, so the work is not a nuisance. It follows that the liability of the defendant cannot be enlarged, under these stated facts and circumstances, to a liability without fault within the rule stated in *Rylands v. Fletcher, supra.* Here the defendant was engaged in an undertaking which required of it the duty of care, but it would not become liable without fault of its own, acting through its servants. *Bohlen, Studies in the Law of Torts,* pp. 407-410; *Beven on Negligence* (4th Ed.), pp. 605-613; *Cooley on Torts* (3rd Ed.), 1186 (680).

There is, however, one further point to weigh. If the defendant had caused the earth and debris to be cast into the channel opposite the shore of the plaintiffs, and so filled it that the plaintiffs' limited navigable access to their shore and dam had been materially affected or destroyed, so that they had sustained damages which were so special and peculiar to their property as to make them substantially different from those suffered by the public generally, the plaintiffs would have a cause of action against the defendant on the theory of the unlawful creation of a private nuisance, since its existence does not necessarily presuppose negligence but may arise from an unlawful act. It has been seen that the defendant was not negligent, so the plaintiffs could not recover unless there was testimony legally sufficient to establish that some act of the defendant had caused the filling and blocking of the channel. There is no such testimony.

The accumulation of earth on the areas devoted to the disposal of the material which had been dredged under preceding years by a number of independent contractors was on government land for the Government's purpose and not for those of the defendant, which went upon the land to perform a specific work. The defendant did not know, and the testimony is that it could not by the exercise of reasonable care have known, of the existence of

any defect in the embankment of the land upon which it was directed to deposit the material dredged. The defendant proceeded in the exercise of reasonable care, prudence, and diligence in the performance of the contract, and it neither knew nor had the means of knowing of any defect, weakening, or danger of the embankment sliding out, because none was observable. There is no testimony from which it could be inferred that the slide was caused or contributed to by the defendant in any way. The slide resulted (a) either from latent defects which existed before the work of the defendant began, and which suddenly and unexpectedly developed, (b) or from a secret and unobservable operation of natural causes. The relatively thin top stratum of earth which the defendant had superimposed on the made ground of the Federal Government was carried out by the movement of the base of the section upon whose top surface it had been spread. There is no testimony of any act on the part of the defendant and its servants which tended to prove that any of them had committed any act of omission or commission which contributed in any way to the injury. The comparatively small deposit of material made by the defendant on the disposal area is not shown by direct or circumstantial testimony to have been the cause of the section's collapse or movement at the base. In order to constitute a nuisance at law, it is required that the wrongful act of the defendant, its agents or servants, be shown, as proof of damage, loss, or inconvenience suffered is not enough to maintain an action. The disposal of the material on the area provided was not unlawful. Until the damage took place there was no cause of action against any one. There was no indication, no knowledge, no promonitary warning of defect in condition or structure, no sign of the going out of the embankment and nothing observable to put the defendant on notice. In what way, then, did the duty arise by which there was imposed on the defendant, before the embankment moved out, the obligation to anticipate or prevent the collapse of the section of the embankment which failed? The defendant did nothing to cause the obstruction of the channel. It can-

not be said it was an act of omission for it not to have taken steps to prevent the unexpected consequences (a) of some unknown and unapparent antecedent act done by the owner or a third party before the defendant went upon the land to dredge, or (b) of some unobservable natural encroachment or erosion occurring at the base of the embankment but below the surface of the water. Before the embankment went down the defendant committed no act of commission nor any of omission, since the defendant knew of no defect or danger to be corrected or averted. A defendant cannot be charged with an act of omission when he is not aware of any condition which requires him to do such an act. See *Greenwell v. Low Beechburn Coal Co.,* 1897, L. R. 2 Q. B. 165, 177, 178; *Hall v. Duke of York,* 1900, L. R. 2 Ch. Div. 493, 498, 499; *Salmond on Torts* (9th Ed.), pp. 245, 266, 267; *Beven on Negligence* (4th Ed.), 602-605; *Pollock on Torts* (8th Ed.), 187, note s.

As set forth in *Dicey on Parties to Actions,* the general rule is that a husband may sue either alone, or jointly with his wife, for all injuries done during coverture to real property of which the husband and wife are seised, or to which they are entitled in right of the wife. Should the husband sue with his wife where she neither must nor may be joined, the error is fatal. *Id.,* rules 32 and 87. The declaration alleges that the plaintiffs are husband and wife, and as such are the owners in fee simple of the tract of land which was injured by the wrongs alleged. The testimony proved that the land affected is owned in severalty by the husband, which is a variance, but not a question on this record, as it is not raised by an appropriate prayer. 1 *Poe, Pl. & Pr.,* secs. 292, 293; *Bullen & Leake's Precedents of Pleading* (1878 Ed.), p. 339; see *Prochnow v. Northwestern Iron Co.,* 156 Wis. 408, 145 N. W. 1098, 1104; *Missouri, K. & T. Ry. Co. v. Starr,* 22 Tex. Civ. 353, 55 S. W. 393.

Since the rulings on the testimony do not affect the views here expressed, it is unnecessary to consider them, as the ruling on the demurrer prayer must be affirmed.

*Judgment affirmed, with costs to the appellee.*