## PROGRESSIVE FRIENDSHIP SAVINGS & LOAN ASSOCIATION, INC. *v.* ROSE

[No. 348, September Term, 1963.]

170

*Decided June 4, 1964.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, HORNEY and MARBURY, JJ.

*Morton H. Perry* for the appellant.

*William C. Mitchell, Jr.,* for the appellee.

HAMMOND, J., delivered the opinion of the Court.

In a suit by a landlord, the appellant, for unpaid rent, the trial court, sitting without a jury, found for the tenant, the appellee, on the ground that he had not agreed to pay as rent the amount on which the landlord based its claim.

The appellee, C. Bowie Rose, is a lawyer who for some time has practiced from an office in Glen Burnie. In 1956 he and a lay associate, John Lane, formed the Anne Arundel County Realty Company and, in its name, leased a building in Glen Burnie for ten years at a rental of $230.00 a month. The lessee made improvements and additions to the building costing about $8,000, mostly on the credit, it would appear, of Rose. At about the same time, Rose, to use his words, was "putting together" the Progressive Friendship Savings and Loan Association, Inc., the appellant, of which he became (and during the times herein pertinent was) a director and counsel. Faced with the imminent prospect of paying for the improvements to the leased building, Rose conceived the idea of having the newly formed building association pay the bills, and become the assignee of the lease of the building in order (a) to have a place of business for itself and (b) to sublet to the existing tenants of the building (the Realty Company, Rose, and one Wagener, a director of the Association) at rentals, based on the amount of space respectively used, sufficient to reimburse it for cost of the im-

provements, plus six per cent discount interest and a bonus of two per cent. The advantage to the Association was to be an office and, in the words of its president, the receipt of sub-rents in "a sufficient amount to make the proposition attractive to the Association," in a total of $10,506, which would be enough to yield a profit of $3,208.

The advantage to Rose was to be that he would still have the office he wanted and be relieved of the obligation and necessity of paying the improvement bills (except to the extent that some of his share of the sub-rentals, based on the proportion of the total space in the building he used, contributed to the repayment of the money the Association used to pay them). As one director of the Association put it from the stand, "[w]e took Mr. Rose off the hook."

Having conceived the idea (of which Lane, his associate, who was a director and secretary of the Association, was in favor), Rose presented it to most of the other directors individually, or as he said, he "sold [it] to the other directors."

This "sale" having been put across informally, the president of the Association appointed a committee of its directors, headed by Herbert Goldman, the certified public accountant for the Association, to ascertain the amount to be paid for the improvements and the amount to be paid as rent by each of the sub-tenants. The committee measured each of the rooms of the building with a tape measure to ascertain the percentage of the total space used by each tenant (for the purposes of the calculation, and for reasons not here material, the small room used by the director Wagener was not counted as part of the total area), figured a basic rent, including electricity, heat and janitorial services, of $1.41 a square foot, added $1.00 a square foot to amortize the cost of the improvements over a three-year period, and estimated the respective monthly rentals as a flat $70.00 (only slightly in excess of the basic rent) for Wagener, $86.00 for three years, and $60.00 thereafter for the Realty Company (occupancy of 17% of the space), $105.00 for three years and $65.00 thereafter for the Building Association (occupancy of 21% of the space), and $310.00 for three years and $200.00 thereafter for Rose (occupancy of 62% of the space).

A formal meeting was called by the directors of the Association for December 13, 1956, to act on the Rose proposal. At the meeting, at which Rose was present, Goldman read a report of his committee, which was made part of the minutes of the meeting, setting out specifically and in detail the basic rent figure, the additional $1.00 a month a square foot to amortize the cost of improvements in three years, the monthly rentals set for each sub-tenant by the committee, the cost of the improvements, $7,298 (with a detailed analysis of how this total was arrived at), the total rent the Association would pay in ten years (at $230.00 a month), $43,230, the total rent it would collect in ten years under the proposed schedule, $53,736, the difference, $10,506, which after deduction of $7,298 left a profit to the Association of $3,208. According to the minutes, there was "a general discussion on the pro-rata share of rents, costs, benefits to the Association and so forth," and thereafter it was moved, seconded and "unanimously carried by the Board that the present lease held by Anne Arundel County Realty Company, be assigned to the * * * Association and the present occupants, being C. Bowie Rose, Anne Arundel County Realty Company, and August Wagener, sub-lease from the Association at the figures stated in the report." The minutes continue: "The bills to be paid, as part of the assignment of the lease, in the attached report, were again read to the Board and upon motion made by Frank Bready, seconded by Irving Robinson, it was unanimously voted that these bills be paid."

The bills were paid, the lease was assigned, and the sub-tenants paid their stipulated rent, except for Rose. He apparently became disenchanted with the proportion of the total space attributed to his use and the amortization of the improvement costs over a three-year period instead of over ten years. (It may be noted that at the rental rate of $310.00 a month for three years and $200.00 a month for seven years the total rent to have been paid would have been $27,960, and at the rental rate of $235.00 a month—sufficient to amortize the improvement costs over a ten-year period which Rose suggested was his idea of what he should have paid—his total rent would have been $28,200.)

Rose had been a tenant for thirty-three months when another corporation took over the Association lease, and at the rate of $310.00 a month owed a total rental in the amount of $10,230. He paid in various installments but $6,580. The Association sued Rose for the balance of $3,650. Judge Duckett found for the defendant, after saying that "[m]y mind has gone back and forward in this case * * * but * * * I cannot, in my own mind, reach a conclusion that this lease was definite, or whether there was a meeting of the minds between the Building Association and Mr. Rose."

Md. Rule 886 a provides that in a case tried without a jury this Court will review on both the law and the evidence but will not set aside the judgment on the evidence unless clearly erroneous after regard has been accorded the opportunity of the trial court to judge the credibility of the witnesses. We think the judgment in this case must be reversed under the tests of the rule.

A lease is, in shorthand, a contract for the possession of land or space on the one side, and a recompense of rental income on the other. *Tiffany, Landlord and Tenant,* Sec. 16, pp. 163-164; *Allen v. Lambden,* 2 Md. 279, 282. Since a lease is a form of contract its creation and construction are subject to the general rules governing the creation and construction of contracts in general. *Saul v. McIntyre,* 190 Md. 31, 36; *Peoples Drug Stores v. Fenton,* 191 Md. 489.

When one in possession of property by grant of the owner pays rent to the owner, a tenancy is "implied by the law from the entry into possession of the premises and the payment and acceptance of the rent." *Cook v. Boehl,* 188 Md. 581, 591.

Rose concedes that the relationship of landlord and tenant existed between the Association and him after the meeting of December 13, 1956, but contends he never agreed to pay the $310.00 a month rental claimed by his landlord to be what he was obligated to pay.

Five of the directors of the Association, who were at the meeting of December 13, 1956, including the president (who presided), the vice president, the secretary (who took the notes of the meeting and the next day wrote the minutes), and the accountant testified that Rose was at the meeting, made the pro-

posal, took great interest in its presentation by Goldman and voted for its adoption as recommended by the Goldman committee. The president and another director recalled specifically that Rose had sat at the president's right all during the meeting. Rose said on direct examination that he left the meeting from time to time to take telephone calls in his office nearby and was not in the room when Goldman's report was read or when it was discussed, or when it was voted on, although he admits he did at some point in the meeting request that the improvement bills be paid and the lease taken over by the Association and that he learned of the $310.00 rent expected of him either immediately after the meeting (which ended after six in the evening) or the next morning. On cross-examination, Rose testified that after he presented the proposal to the meeting he left the room from, apparently, a sense of delicacy in that he said he did not want to be present when the matter was discussed. Later in the cross-examination he became less sure he had not been present at any critical stage of the proceeding. First he said he was not sure he did not sit next to the president (which he had denied on direct examination) and later, when asked if he voted on his proposal, said: "I don't think so, I don't think I went back [into the meeting room] after that." When asked if it was not possible he had voted on the matter, as the minutes indicated, and whether he was certain he had not, Rose replied each time: "I don't think I did."

If Rose did vote to accept the Goldman details of his proposal, as the testimony and exhibits heretofore referred to strongly indicates that he did, and then occupied the leased space and paid rent to the current owner, it is clear that he became a tenant at a monthly rental of $310.00. Judge Duckett found from his personal knowledge of Rose's temperament and habits—he described him as "filled with nervous energy" and as "like a bee on a hot griddle"—that the testimony of the five directors that he had not left the room during the meeting was incredible. If we assume that the trial judge's opportunity "to judge the credibility of the witnesses," to which Md. Rule 886 a directs us to give "due regard," permitted Judge Duckett to make this finding without being clearly in error, as to which

the record leaves us in very strong doubt, we are persuaded that other elements of the Association's proof require the conclusion that Rose was a tenant bound to pay $310.00 a month rent.

The president of the Association, the vice president, its secretary, and another director testified that at the January 10, 1957 meeting of the directors of the Association, which was the next meeting after that of December 13, Rose was present, that the minutes of the December 13 meeting were read by the secretary, that the president asked if there were any corrections or changes, that none was suggested or asked for, and that all present voted to adopt the minutes of the December 13 meeting as read. Rose did not challenge, refute or contradict this testimony in any way or to any extent. When he voted at the January meeting he was already a tenant, he knew his rent had been set at $310.00 a month, he was unhappy about it and had been advised by Goldman that a rent figure based on a ten-year amortization would be $235.00 a month, yet he, a director of and the lawyer for the Association, voted to adopt as correct minutes of the Association which said that he had, on December 13, 1956, voted to become a tenant at $310.00 a month.

After having done this, he continued in possession of the leased space and paid substantial sums of rent to the landlord. We think that he could not be heard to argue, at the conclusion of the case below, that he had not been a tenant for thirty-three months, who was obligated to pay $310.00 a month rent.

Rose admits that never did he ask the directors of the Association at any meeting to change the terms of his tenancy, although he did complain to individual directors about the amount of his rent (the reply seems always to have been that they could do nothing about it). The impression given by his testimony on the point and that of those to whom he complained is that Rose did not behave like one who was not bound to pay $310.00 a month but like one who desired a change in the terms that bound him to $310.00 a month.

The Association offered in evidence its rent ledger cards, kept in the ordinary course of business, showing rent due by Rose to it on the first of each month from January 1, 1957, to Sep-

tember 1, 1959, of $310.00. The first payment marked "on account" was received on April 26, 1957, in the amount of $1,-000. At that time $1,240 was due at $310.00 a month and $940.00 would have been due under Rose's theory of $235.00 a month. The next payment was $2,000 on February 4, 1958. A third payment was $2,875 on November 26, 1958, when the Association claimed $4,130 to be due, and on Rose's rent figure of $235.00 a month $2,405 would have been owed. We think it improbable that Rose would have paid more than he thought he was obligated to pay on April 26, 1957, and then on November 11, 1958, pay $470.00 more than he claims now was then due, particularly when two months later, on January 21, 1959, he paid $470.00 more, which he would not have been obligated to do under his rent schedule since he at that date would have been two months ahead as a result of his November 1958 payment.

We find from the record as a whole the judgment below was clearly erroneous.

Rose makes an alternative contention that because the Southfield Corporation, which he claims, without proof or elaboration, was his alter ego, took over the Association's lease in September 1959 at a rent of $320.00 a month—or $90.00 more than the Association's rent which it could use to amortize the cost of the improvements—this wiped out any obligation he had to the Association. We find nothing in the record to support this theory except Roses' claim that it should be so, and much that refutes it. There is nothing in the minutes of the Association or other writings as to the transfer of the lease to suggest that the Association was in any way or to any extent releasing Rose from any amount he might owe it. The Association has not wavered in its continuous assertion that it is owed rent by Rose, and it made the claim it now presses immediately before and immediately after the transfer of the lease and did not hint at a waiver or an accord and satisfaction in making the transfer.

*Judgment reversed, with costs, and judgment entered for appellant against appellee for $3,650, with interest from July 23, 1963.*