ANNAPOLIS FIRE AND MARINE INSURANCE COMPANY *v.* RICH ET AL., TRUSTEES

[No. 330, September Term, 1964.]

Decided July 30, 1965.

The cause was argued before HAMMOND, HORNEY, MARBURY, SYBERT and BARNES, JJ.

Lawrence B. Coshnear and A. David Gomborov for the appellant.

Eben F. Perkins, with whom were Perkins & Rich on the brief, for the appellees.

BARNES, J., delivered the opinion of the Court.

The appellees, Edward L. Rich, Jr. and The Equitable Trust Company, Trustees under the Will of Charles Combs Burch, as owners and landlords of the property 112 East Madison Street in Baltimore City sued General and Excess Underwriters, Incorporated (General), Annapolis Underwriters, Inc. (Underwriters) and the appellant, Annapolis Fire and Marine Insurance Company (Annapolis Fire), as tenants holding over to recover rent for the months of February, March and April

1963 amounting to $675 ($225 a month) for the first floor of 112 East Madison Street and three automobile parking spaces. The action was filed in the Superior Court of Baltimore City. It was tried before Judge Sodaro, without a jury. Judge Sodaro, after testimony was taken and arguments presented, rendered judgment against Annapolis Fire for $675. Judgments by default had previously been entered against General and Underwriters and judgments on inquisitions were made absolute against them. The motion of Annapolis Fire for a new trial or for judgment n.o.v. in its favor was overruled by the lower court and this appeal was entered by Annapolis Fire from the final judgment against it.

The original written lease for the first floor of 112 East Madison Street, with three automobile parking spaces in the rear of the premises with the use in common with other tenants of the front entrance hall (the premises) was executed by Charles Combs Burch as lessor and General as lessee on August 26, 1957. The term of the lease was for five years beginning September 1, 1957 and ending, without notice, on August 31, 1962. The annual rent was $2700 payable in equal monthly installments of $225 each, in advance, on the first day of each month during the term. Paragraph 5 of the lease provided as follows:

> "5. The Lessee covenants that it will not assign or sublet this Lease without the prior consent in writing of the Lessor, first had and obtained, such consent, if given, to be restricted to such person or persons to whom or for such purpose or purposes for which such consent shall be specifically given, such consent not to be construed or taken as in any way waiving this general provision and restriction."

Paragraph 9 of the lease provided:

> "9. The Lessee shall have the privilege of placing a sign in the panel space between the two front windows on the Madison Street side of the first floor."

General placed a substantial sign as permitted in paragraph 9, bearing the legend: *"General Excess Underwriters, Inc., cor-*

*respondents for Insurance Underwriters at London and Paris."*

After Mr. Burch died, the appellees, as trustees under his will, assumed control over the premises in 1961.

General, Underwriters and Annapolis Fire had a close business relationship. They were in various aspects of the insurance business and had a number of officers, directors and stockholders in common with each other. For example, Monroe H. Lowitt was president and a stockholder of General, an officer and stockholder of Underwriters, and a vice president (but not a stockholder) of Annapolis Fire. He helped to organize Underwriters and Annapolis Fire. Underwriters was the underwriting agent for Annapolis Fire.

General became embarrassed financially and during the term, Underwriters and Annapolis Fire moved into and occupied the premises some time in 1959. Annapolis Fire placed a substantial sign on the Madison Street outside wall of the premises directly under the sign of General, bearing the legend: *"Home Office Annapolis Fire and Marine Insurance Company."* Mr. Lowitt testified that he obtained the permission of Mr. Burch to place the Annapolis Fire sign on the front wall of the premises.

When Mr. Rich, a member of the Maryland Bar and a co-trustee under Mr. Burch's will, first inspected the premises on behalf of the trustees, he saw the signs on the Madison Street wall of the premises. He indicated that there is also a similar Annapolis Fire sign on the Calvert Street side of the premises. Mr. Rich received a letter dated June 8, 1962 from Mr. Lowitt on the letterhead of General which stated:

> "This is to advise you that we do not expect to renew our lease which expires on November 30, 1962." [1]

After receipt of this letter, Mr. Rich had a conference with Mr. Lowitt on July 5, 1962 at the premises. Mr. Rich testified that he had met Mr. Lowitt before and knew he was the owner and general manager of General, the lessee referred to

---

1. This date was an error; the lease expired by its terms on August 31, 1962.

in the lease of August 26, 1957. Mr. Lowitt identified himself as also being an officer of Annapolis Fire and also as an officer of Underwriters. Mr. Rich then gave the following account of the conversation:

"Mr. Lowitt told me the General and Excess Underwriters, Inc. was completely broke and were very much in debt, and that Annapolis Fire and Marine Insurance Company were occupying the premises and had been for some time, and that Annapolis Underwriters, Inc. were also occupying them and had been for some time, and the rent had been paid sometimes by Annapolis Underwriters and sometimes by Annapolis Fire and Marine. I told him I was very glad we had three tenants now which we would accept in place of the one we had, and we had some who could pay the money. We talked about some payment. He talked about whether they were going to stay. He expressed the fact that they were going to move to One Charles Center, which had not been done. I called their attention to the fact they had cheaper rent, with a parking area, and urged them to stay. He said under the circumstances they did not know what they were going to do but they were there for the time being."

After returning to his office, Mr. Rich confirmed his conversation with Mr. Lowitt by a letter dated July 5, 1962. This letter is as follows:

"Mr. Monroe H. Lowitt,
General and Excess Underwriters, Inc.,
Annapolis Fire and Marine Company,
Annapolis Underwriters, Inc.,
112 E. Madison Street,
Baltimore 2, Maryland

Re: *The Burch Estate*

Dear Mr. Lowitt:

This will confirm my talk with you today to the effect that the Trustees will be glad to have you continue leasing the property known as 112 E. Madison

Street, first floor, from the Burch Estate. We do not know where you will get as much area with parking lots available as exist at 112 E. Madison Street for the amount of money which you are now paying, and accordingly suggest that you consider this matter very seriously.

We are pleased to learn today that you are considering the possibility of continuing to lease these premises at the expiration of the present lease.

If there is anything we can do to make your stay pleasant and confortable [comfortable], we will be glad to consider same."

The letter was signed by Mr. Rich as Executor and Trustee of the Estate of Mr. Burch and a copy was sent to Mr. Laun, Assistant Trust Officer of The Equitable Trust Company. Shortly thereafter Mr. Rich instructed the officers of The Equitable Trust Company, co-trustee, to bill all three corporations for the rent, but, apparently through inadvertance, the Trust Company continued to send bills for the rent to General as it had done theretofore.

After Underwriters and Annapolis Fire had moved into the premises, Underwriters sent the $225 rent each month to The Equitable Trust Company by its corporate check. Annapolis Fire gave its corporate check each month for $112.50 to Underwriters.

General, Underwriters and Annapolis Fire continued to occupy the premises after August 31, 1962, the end of the term specified in the written lease. Mr. Rich testified that Robert G. Lembach, attorney for the three corporations, telephoned him on February 25, 1963 and advised him that Underwriters had moved out of the premises and that Annapolis Fire was going to move out and "wanted to get out by the first of March 1963." During that conversation, Mr. Rich told Mr. Lembach that "They had been accepted under the lease earlier, and they had to pay the rent" to which Mr. Lembach replied: "I understood we were on a month to month basis." Mr. Rich replied: "No you are not, you are all responsible for the rest of the year from August 31." Mr. Rich testified further that Mr.

Lembach told him on March 26, 1963 that Annapolis Fire and Underwriters had been paying the rent.

Diligent efforts were made by the landlords to rent the premises after they were fully vacated at the end of March, 1963, but without avail. Written demands by the landlords to pay the rent due for February and March, 1963, and to become due on April 1, 1963, were sent to Underwriters and to Annapolis Fire on March 28, 1963, with the statement in each letter "we hold you jointly and severally liable on this rent with other tenants of this space."

The landlords contend that by the entry of Underwriters and Annapolis Fire into the premises, the payment of rent and the placing of the signs on the buildings, Underwriters and Annapolis Fire became jointly and severally liable for the rent as tenants and when the two corporations, with General, held over as tenants after August 31, 1962 they were liable for the rent for the next year as tenants from year to year. On the other hand, Annapolis Fire contends that Annapolis Fire was not a co-tenant holding over on the written lease because it was not a party to it, nor was it liable for rent under an oral lease because there was no intention to make one and no meeting of the minds with respect to such an oral lease; that the landlords could not grant Annapolis Fire any leasehold estate when the written lease for the premises was in effect; that Mr. Lowitt, as vice president of Annapolis Fire had no authority to bind the corporation by his representations; and, that the landlords elected to charge General and Underwriters as tenants holding over, thereby excusing Annapolis Fire from liability. The basic position of Annapolis Fire on the facts is that it was a sub-tenant of the premises and not a co-tenant, liable for the rent as a tenant holding over. Judge Sodaro did not file an opinion in the case, but by directing the entry of judgment against Annapolis Fire, he necessarily found that Annapolis Fire was a co-tenant holding over and was not a sub-tenant.

We are of the opinion that the lower court's finding was not clearly erroneous and, in accordance with Maryland Rule 886a, the judgment must be affirmed.

It is uncontradicted that both Underwriters and Annapolis Fire were in possession of the premises, together with General

in 1959 and thereafter, prior to the termination of the written lease of August 26, 1957. The close business relationship between the three corporations, the cessation of payment of the rent by General and the assumption of that obligation by Underwriters and by Annapolis Fire (at least indirectly) indicates that the possession of Underwriters and Annapolis Fire was with the consent of General.

The testimony of Mr. Lowitt that Annapolis Fire obtained the permission of Mr. Burch during his lifetime to place the Annapolis Fire "Home Office" sign on the outside walls of the premises, indicates that even prior to July 5, 1962 the landlord had recognized Annapolis Fire as a co-tenant of the premises, with General and Underwriters (from which corporation he had been receiving the rent), and that Annapolis Fire considered its position at that time to be that of a co-tenant. Otherwise, if it had considered itself to have been a sub-tenant of either General or of Underwriters, or of both, it would have merely obtained *their permission* and General or Underwriters, or both, would have made whatever arrangements were required to obtain the landlord's permission for the placing of the home office sign of Annapolis Fire. Whatever may have been the relationship between the tenants *inter sese* and by them with Mr. Burch, the landlord, the conversation between Mr. Lowitt, representing all three corporations, and Mr. Rich, representing the landlords, on July 5, 1962 (confirmed in basic part by Mr. Rich's letter of the same date) justified the trial court in finding that the relationship thereafter between the parties was that the three corporations were co-tenants of the premises under an oral lease which contained all of the terms of the written lease of August 26, 1957, except that thereafter there were three co-tenants liable jointly and severally for the annual rent of $2700, payable in equal monthly installments of $225. It is significant that after the conversation of July 5, 1962 and the receipt of the confirming letter addressed to all three corporations (and to Mr. Lowitt as their representative), the rent for August 1962 was paid. In other words, the three corporations remained in possession and the rent was paid under the arrangement made on July 5, 1962. It is well established that entry by a person, with the subsequent payment of rent, creates

582

a periodic tenancy. See *Progressive Ass'n v. Rose,* 235 Md. 169 at p. 174, 201 A. 2d 8 at p. 11, where it is stated:

"When one in possession of property by grant of the owner pays rent to the owner, a tenancy is 'implied by the law from the entry into possession of the premises and the payment and acceptance of the rent.' *Cook v. Boehl,* 188 Md. 581, 591."

See also 1 *American Law of Property,* Sec. 3.20, page 218, where it is stated:

"A lease which fails to comply with the Statute of Frauds is not absolutely void. * * * Where, as is usually the case, there is an entry plus payment of rent, a periodic tenancy is created in all but a very few states.[2] In some states it is said that a periodic tenancy arises when there is an entry under an oral lease reserving a periodic rental, although no rent is actually paid."

There is no problem raised by the parol evidence rule as the Maryland law is well established that the abandonment of a contract under seal may be proved by parol evidence. *Malin v. Robinson,* 194 Md. 104, 109, 70 A. 2d 51, 54 (1949) involving the abandonment by mutual oral agreement of a contract under seal for the sale of real estate. See *Tashjian v. Karp,* 277 Mass. 42, 177 N.E. 816 (1931) involving a new oral lease during the term of a three year written lease, with different terms and provisions. In sustaining the oral lease the court stated:

"It has long been settled in this Commonwealth that a written contract under seal before breach may be varied by a subsequent oral agreement made upon a legal consideration. 'Such a subsequent oral agreement may enlarge the time of performance, or may vary any of the terms of the contract, or may waive and discharge it altogether.' " (citing cases). (page 817 of 177 N. E.).

Annapolis Fire contends that there was no surrender of the

---

2. Maine and Massachusetts.

written lease in writing as required by the third section of the Statute of Frauds, 29 Charles II, Chapter 3, Section III, and relies on *Prevas v. Gottlieb,* 229 Md. 188, 182 A. 2d 489 (1962). The decision in the *Prevas* case turned upon the facts in that case which were quite different from those in the case at bar. In *Prevas* the contention was that the landlord had orally indicated to one of the partnership tenants that she would "let him off" the five year written lease for the partnership premises. The landlord denied this. The partnership was dissolved during the term and the retiring partner thought he was released from his obligation as a tenant under the written lease but the dissolution agreement did not state this. The rent continued to be paid by the partnership in the same form of checks as theretofore. Later the remaining partner became insolvent and the landlord sought recovery against the retiring partner. We held in that case that the admissible evidence did not establish an oral surrender of the lease. In the case at bar, General, the tenant in the written lease, was insolvent and had discontinued the payment of the rent. This obligation had been met by the other two corporations in possession. The entire new leasing arrangement was agreed to by all of the parties on July 5, 1962, and this amounted to an assumption of possession under the new arrangement. Even assuming *arguendo,* that the oral surrender and new oral lease were ineffective under the Statute of Frauds, nevertheless, the three corporations would, in any event, as tenants holding over be deemed tenants from year to year of a tenancy governed by the terms of the written lease (made part of the oral lease by agreement) as to annual rent, terms of payment and other terms except as to the term of years itself. See *Hyatt v. Romero,* 190 Md. 500, 58 A. 2d 899 (1948) involving an invalid lease for more than seven years not recorded as required by Code, Art. 21, Sec. 1. See also *Darling Shops Delaware Corp. v. Baltimore Center Corp.,* 191 Md. 289, 60 A. 2d 669 (1948)—citing the *Hyatt* case with approval—in which Chief Judge Ogle Marbury, speaking for the Court, stated in the opinion:

> "When a tenant is put in possession of property under a lease which is unenforceable under the statute

of frauds, or which passes no estate for any statutory or other reason, he is, nevertheless, lawfully in possession and holds as some sort of tenant. The same thing is true of a tenant who goes into possession under a valid lease for a term of years, and remains over, with the consent of the landlord. At first, under the common law, it was held that in these situations the tenant was a tenant at will, who could be put out at any time by the landlord. This created great hardship on tenants, particularly those in agricultural districts, and, eventually, it was determined that such a tenant held from year to year, or from quarter to quarter, or from month to month, depending on the manner in which the rent was calculated in the void or unenforceable lease, or in the original lease for a term of years. * * *

"It was necessary for the courts to go further, and to determine, not only the kind of tenancy thus established, but the terms on which such tenancy was held. The natural and reasonable conclusion was adopted that a tenant who went into possession under a void or unenforceable lease and paid the rent named in such lease, or who held over, after the expiration of a lease for a term of years, and thereafter paid the same rent as that named in the lease, intended to occupy the leased premises under the same terms and conditions, except for the fact that he was a tenant from year to year (or from quarter to quarter, or from month to month), and that all the terms and conditions of the original lease, whether void, unenforceable or expired, carried over into the new renting, except that the tenancy was different, and that, during the term of the original unenforceable or void lease or after the original valid lease had expired, the tenant was entitled to the common law notice required to determine his new kind of tenancy." (pages 293-294 of 191 Md.; pages 670 and 671 of 60 A. 2d).

It is clear that under the provisions of the Statute of Frauds, oral leases within the Statute [3] and surrenders were not invalid or illegal, but merely unenforceable if there were no compliance with the requirements of that statute. When, as in the case at bar, the oral lease was completely executed on both sides—the three tenants remaining in possession until August 31, 1962 and the rent having been paid until that time—neither landlords nor tenants can successfully challenge the executed oral lease on the basis of non-compliance with the requirements of the Statute of Frauds. *Nicholson v. Schmucker,* 81 Md. 459, 32 Atl. 182 (1895). See also *Bruns v. Spalding,* 90 Md. 349, 361, 45 Atl. 194, 196 (1900) and *Crane v. Gough,* 4 Md. 316, 332-333 (1853). There being an oral lease entered into by the three corporate co-tenants in effect at the termination of the tenancy and a holding over by them with the continued payment of rent by the tenants and the acceptance of the rent by the landlords, the three tenants held over as tenants from year to year, and were jointly and severally liable for the rent for the year beginning September 1, 1962 and ending August 31, 1963. The tenancy of the tenants holding over was a new tenancy, subject to the terms of the prior lease except as to duration. *Smith v. Pritchett,* 168 Md. 347, 178 Atl. 113, 98 A.L.R. 212 (1935). See also Rhynhart *"Notes on the Law of Landlord and Tenant,"* 20 Md. L. R. 1, at pages 6, 7 and 12 and the cases cited in Notes 44 to 47, and 93.

In our opinion the trial court was justified in finding from the evidence that Mr. Lowitt, as vice president of Annapolis Fire, had apparent authority to enter into the oral lease on behalf of that corporation. He was in charge of the operation of the corporation's business at the premises, the home office of the corporation. The leasing of premises as a home office for Annapolis Fire was essential to the operation of the corporation's

---

3. Under the provisions of the Statute of Frauds, 29 Charles II, Chapter 3, Section II, oral leases of less than three years duration do not require a writing to be enforced. The oral lease in the case at bar only extended from July 5, 1962 to August 31, 1962, or much less than for three years so that no writing was required by the Statute to enforce it. See Union Banking Co. v. Gittings, 45 Md. 181, 196-197 (1876).

business. He represented to Mr. Rich that he had such authority [4] and after receiving Mr. Rich's confirming letter of July 5, 1962 addressed to all three corporations, Annapolis Fire did not repudiate the arrangement described in that letter or indicate to the landlords that Mr. Lowitt had no authority to bind it. On the contrary, after receipt of the letter of July 5, Annapolis Fire continued in possession of the premises and, in effect, continued to pay one-half of the rent for the premises. Annapolis Fire accepted the benefit of the bargain made for it by Mr. Lowitt, its vice president. This conduct amounted to a ratification of Mr. Lowitt's action in entering into the oral lease on behalf of Annapolis Fire. See *Webb v. Duvall,* 177 Md. 592, 11 A. 2d 446 (1940); *Equitable Gas Light Co. v. Baltimore Coal Tar Co.,* 65 Md. 73, 3 Atl. 108 (1886); *Grape Sugar & Vinegar Manufacturing Co. v. Small,* 40 Md. 395 (1874); and *Northern Central Railway Co. v. Bastian,* 15 Md. 494 (1860). See also Brune on *Maryland Corporation Law and Practice* (Revised Edition) Section 232, pages 231 to 236.

For these reasons, the judgment entered by the trial court will be affirmed.

> *Judgment affirmed, the costs to be paid by the appellant.*

---

4. The declarations by an agent that he has authority to bind the principal are not sufficient, of themselves, to establish the agency. See Posko v. Climatic Control Corp., 198 Md. 578, 84 A. 2d 906 (1951). When the scope of the agency is otherwise proved or if the agency has been ratified, as in the case at bar, the statement of the agent as to the extent of his authority is admissible as evidence of his power to bind the principal. See 2 Restatement of Agency, Sec. 284, comment b.