958 A.2d 269

**LA BELLE EPOQUE, LLC, et al.**

v.

**OLD EUROPE ANTIQUE MANOR, LLC, et al.**

No. 127, Sept. Term, 2007.

Court of Appeals of Maryland.

Oct. 8, 2008.

196

David M. Schoenfeld (Aine F. Smith, Ward & Klein, Chtd., Rockville, on brief), Michael J. McAuliffe, Rockville, for Petitioners.

Jeffrey M. Goldstein (Goldstein Law Group, Leesburg, VA, Gary L. Segal, Law Office of Gary L. Segal, Rockville, on brief), for Respondents.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, IRMA S. RAKER, (Retired, Specially Assigned) and DALE R. CATHELL, (Retired, Specially Assigned), JJ.

GREENE, J.

In this case we must determine whether the Circuit Court for Montgomery County properly entered summary judgment in favor of Petitioners, Double H Family, LLC, and its principal Judith Goozh (collectively, "Double H Family") and La Belle Epoque, LLC, and its owners Mark Hoover and Marie Christine Hoover (collectively, "La Belle Epoque"). On the record before us, we shall hold that the Circuit Court erred in granting summary judgment on the basis that there was no genuine dispute of material fact as to whether Respondent, Old Europe Manor, LLC ("Old Europe") was a tenant of Double H Family. Further, we shall hold that the Circuit Court erred in concluding, as a matter of law, that Old Europe's status on Double H Family's property was that of either a licensee or a trespasser.

In February 2003, the Washington, D.C. metropolitan area was hit by a winter storm of unusually heavy rain and

snowfall. Following the storm, Old Europe sustained considerable water damage to its merchandise and the space it occupied, allegedly, when runoff water trapped by accumulated trash and debris infiltrated the premises at 4124–F Howard Avenue in Kensington, Maryland. On May 2, 2005, Old Europe and owner, Isabelle Sanchez–Tintenier,[1] filed a civil action seeking damages from Double H Family and La Belle Epoque. Old Europe sued Double H Family for negligence, breach of contract, and breach of the covenant of good faith and fair dealing. In the negligence count against La Belle Epoque, Old Europe maintained that La Belle Epoque negligently created the pile of debris and trash outside the shared building which subsequently led to the infiltration of runoff water into Old Europe's space. Upon motions by La Belle Epoque and Double H Family, the Circuit Court for Montgomery County granted summary judgment on all counts against Old Europe.

Old Europe filed a timely appeal to the Court of Special Appeals and that court subsequently vacated the Circuit Court's judgment. The intermediate appellate court agreed with the trial court that Old Europe could not assert rights against Double H Family under a lease that was orally transferred to Old Europe because the oral assignment did not satisfy the Statute of Frauds.[2] The Court of Special Appeals concluded, however, "that there [we]re material disputes as to whether Old Europe became Double H Family's periodic tenant by operation of law and as to whether Double H Family and La Belle Epoque negligently caused damage to its neighbor." We granted both Double H Family's and La Belle Epoque's petitions for writ of certiorari.[3]

---

1. Sanchez–Tintenier is referred to as "Tintenier" in the documents from some of the earlier proceedings.

2. Md.Code (1974, 2003 Repl Vol.) § 5–103 of the Real Property Article.

3. Double H Family presented the following questions in its petition:
 1. Whether the Court [of Special Appeals]'s holding that a non-tenant's payment of rent creates a commercial tenancy at common law imposes a new and commercially unreasonable duty upon Land-

## BACKGROUND

The relevant facts taken in a light most favorable to Old Europe are as follows. Double H Family is the owner of a commercial two-story building on Howard Avenue in Kensington, Maryland. The building has two leased spaces: 4088–A Howard Avenue (the upstairs space) and 4124–F Howard Avenue (the downstairs space). The building sits against the side of a hill so that the downstairs space opens onto Howard Avenue and the upstairs space can only be accessed by "an [elevated] alley at the base of the building that runs parallel to Howard Avenue."

On July 23, 2001, Double H Family executed a five-year lease ("the Lease") with Francois Desbois for the premises known as 4124–F Howard Avenue for the operation of his antique business, Vieille France Antiques. Both Desbois and Sanchez–Tintenier, who was the vice president and secretary of Vieille France Antiques at that time, were present at the signing of the Lease. Sanchez–Tintenier played a large role in negotiating the Lease because Desbois does not speak English. At some time either prior to or after the execution of the Lease with Desbois, Double H Family leased 4088–A Howard Avenue to La Belle Epoque for its antique storage business.

---

lords to verify the payor of each and every rental payment before acceptance?

2. Whether a common law commercial tenant is entitled to the same consumer protections given a residential tenant at common law?

3. Whether the Court [of Special Appeals]'s decision is against the public interest as it creates uncertainty with regard to the landlord/tenant relationship?

La Belle Epoque presented the following questions in its petition:

1. If a tenant abandons a leased property, and a new party takes possession of the property without a lease, does the new party automatically become a tenant even if the landlord was unaware of the change?

2. Can a person (or entity) gain the benefits of tenancy by simply taking over the leased premises and submitting checks to the landlord, even when the landlord is not aware that the new person (or entity) is different from the tenant?

The Lease between Double H Family and Desbois commenced on September 1, 2001, for a five year term ending on August 31, 2006. In relevant part to this appeal, the Lease reads:

2.5 *Repairs and Improvements.* Landlord shall deliver the Premises with all electrical, mechanical and plumbing systems and equipment in good working condition. And will replace the sink and toilet.

Landlord shall be responsible for maintenance and repair of the roof, exterior walls, foundation, downspouts, gutters and structural elements of the building of which the Premises are a part, unless such repair or maintenance is necessitated by any act or neglect of Tenant or anyone acting by, through or under Tenant.

Except as provided in the preceding paragraph, Tenant shall promptly repair, at Tenant's expense, any damage to the Premises and to any equipment, systems, and facilities therein, and will make all repairs and replacements thereto, whether such repairs and replacements be necessitated by ordinary wear and tear or other event of any kind, except a Casualty as provided in Section 3.2 hereof. Without limiting the generality of the foregoing, Tenant's maintenance, repair and replacement responsibilities shall include the interior of the Premises, all doors, windows and loading docks, if any, and all electrical, mechanical, plumbing, heating, ventilating, air conditioning, security, fire prevention, and sprinkler systems and equipment, if any, presently or hereafter installed in the Premises. Tenant has had the opportunity to inspect the Premises and is leasing the Premises "AS IS", without any representation, warranty, or covenant by the Landlord or Agent respecting the suitability of the Premises for Tenant's use thereof of the condition of the Premises or any element thereof.

\* \* \*

Tenant shall pay all expenses of operating and maintaining the Premises, including, but not limited to, expenses for

refusal removal, janitorial services, carpet cleaning, and painting. . . .

\* \* \*

2.7 *Notices.* All notices hereunder shall be made in writing and shall be hand delivered or mailed by Registered or Certified U.S. Mail, Return Receipt Requested, First Class, postage prepaid, to the parties hereto at their respective addresses set forth below, or at such other address of which either party shall notify the other in accordance with the provisions hereof. Any notice required to be given hereunder on or before a specified date shall be deemed to have been duly and timely given if hand delivered before 5:00 P.M. on such date, or when given by mail as aforesaid, if postmarked before Midnight on such date. Notices given by mail shall be addressed:

IF TO LANDLORD:

Double H Family LLC

c/o David Dant

Michael Management, Inc.

4390 Parliament Place, Suite A

Lanham, Maryland 20706

IF TO TENANT:

Desbois Francis

4124–F Howard Avenue

Kensington, Maryland 20875

\* \* \*

3.1 *Assignment and Subletting.* Tenant will not assign this Lease, in whole or in part, or sublet all or any part of the Premises, without first obtaining the Landlord's written consent. This prohibition includes any subletting or assignment which would otherwise occur by operation of law, merger, consolidation, reorganization, transfer, or other change of Tenant's corporate or proprietary structure, or an assignment or subletting to or by a receiver or trustee in any bankruptcy, insolvency, or other proceedings. Consent by Landlord to any assignment or subletting shall not

constitute a waiver of the requirement for Landlord's consent to any subsequent assignment or subletting. The acceptance by Landlord of the payment of rent following any assignment of subletting shall not be deemed to be a consent by Landlord to such assignment or subletting.

Sanchez–Tintenier was principally responsible for the operation of Desbois's business. She was the sole employee of the store from the outset of Desbois's tenancy. She managed the store, corresponded with Double H Family's leasing agent on matters affecting the business, and prepared checks drawn on Desbois's Riggs banking account for Desbois's signature (Sanchez–Tintenier never signed checks on behalf of Desbois). Sanchez–Tintenier was single-handedly responsible for the store's operation because Desbois did not live in the United States. Instead, he lived in France and visited the United States every two or three months for 10 to 14 days at a time. Sanchez–Tintenier was not, however, responsible for the store's inventory and pricing; that task was left solely to Desbois.

About a year into Desbois's five-year Lease with Double H Family, Desbois removed his merchandise from the premises and discontinued his U.S. business. Sanchez–Tintenier took over the premises in July or August 2002, paying Desbois approximately $10,000 to do so. Sanchez–Tintenier recalled that she paid Desbois "$7,500 for the rent and then $2,500 in a security deposit." Desbois sold Sanchez–Tintenier the business name—Vieille France Antiques—for $1.00. Sanchez–Tintenier, however, initially called her business "Vieille France and German Antiques," but soon after September 11, 2001, she changed the name to "Old Europe Antique Manor." Despite the name change, Sanchez–Tintenier did not replace the sign bearing the name "Vieille France Antiques" until September 2003, after the flood in February.

Sanchez–Tintenier believed "that both Michael Management [4] and Double H Family knew that [she] was the tenant of

---

**4.** Michael Management, Inc. was the property manager for Double H Family. The record reflects that, as property manager, Michael Man-

4124–F Howard Avenue." Sanchez–Tintenier contends that she told David Dant of Michael Management "that I am going to take care of the store and to take over the store and that [Desbois] don't (sic) want anymore." She further contends that Dant told her "[t]hat it was no problem" and "that was fine to take it over." Sanchez–Tintenier understood that she would be subject to the Lease that was signed by Desbois. According to Sanchez–Tintenier, she informed Dant of the transfer and was never told by Michael Management that she needed to contact Double H Family directly.

After taking over the space from Desbois in August 2002, Sanchez–Tintenier made monthly rental payments to Michael Management for the next 17 months. She usually wrote the checks on her Riggs bank account, in the name of "Old Europe Antique Manor LLC[;]" although, between five and seven times she paid the rent by certified check or money order.[5] Although Michael Management accepted rental payments from Sanchez–Tintenier, it continued to address the rental bills to Desbois.

### Storm Damage

In its complaint, Old Europe contends that in the weeks prior to the February 2003 storm, La Belle Epoque "negligently and recklessly created a huge pile of debris outside" the building that Old Europe and La Belle Epoque occupied. On behalf of Old Europe, Sanchez–Tintenier also contends that she issued complaints, about the accumulated debris, to Michael Management, Double H Family's leasing agent; however, Double H Family and La Belle Epoque "failed to cause

---

agement collected rent from tenants, assisted with lease contracts, addressed tenant concerns, and made minor repairs. The record further reflects that upon collecting tenants' lease payments, Michael Management deposited the checks into its checking account, paid itself an agreed upon commission, and then forwarded the remaining amount of rent collected to Double H Family via check from its (Michael Management's) bank account.

**5.** The certified checks and money orders do not contain account identification information.

the debris to be removed" prior to the flood. It is alleged that when Kensington was hit with "substantial snowfall and rain," melted snow and surface water accumulated among the debris, entered the building through the second floor and then "poured into the antiques store." According to Old Europe, "[t]he area of the property that caused the damage was in the exterior part of the property, where tenant La Belle Epoque had placed garbage and debris" outside its upstairs unit. Sanchez–Tintenier described the water infiltration as a "flood," where the "water was going around the walls like Niagara Falls, and the ceiling too." Water accumulated up to about 20 to 25 centimeters in the store. According to Sanchez–Tintenier, she suffered more than $300,000.00 in damages to her inventory and was "forced ... to close" as a result of the flood. In addition, Sanchez–Tintenier contends that she suffered cardiac problems relating to the stress of dealing with the aftermath of the flood.

## Post–Storm Dealings

According to Sanchez–Tintenier, after the storm damage in February 2003, Double H Family's agent "came on several occasions to inspect the damage from the flood, and met with [Old Europe's] former attorney, Bill Scanlin, on several occasions." In April 2003, the agent notified Sanchez–Tintenier that she "could reenter the premises." In May 2003, the agent entered the premises to take photos of a ceiling that had collapsed. In June, July, and September of 2003, as well as January and February of 2004, the agent inspected the premises and, according to Sanchez–Tintenier, "[o]n each of the occasions he promised that he would take [care] of the damage and make needed repairs."

In addition, Sanchez–Tintenier "met Lou Kressin of Double H Family" at least twice after the flood. In May 2003, Kressin came to the premises and told Sanchez–Tintenier "that he was [her] landlord and that he was there to meet an insurance agent to file a claim [regarding] the flood." Sanchez–Tintenier met Kressin again in March 2004 when the Montgomery County Environmental Protection Agency in-

spected the premises after a report of mold infestation. On April 1, 2003, Sanchez–Tintenier and Desbois presented to Double H Family a signed amendment to the original Lease transferring the Lease from Desbois to Sanchez–Tintenier. Double H Family, however, would not consent to the assignment at that time.[6]

### Legal Proceedings

On May 2, 2005, Old Europe filed, in the Circuit Court for Montgomery County, a complaint against Double H Family and La Belle Epoque. Old Europe alleged that Double H Family was liable for negligence, breach of contract, and breach of the covenant of good faith and fair dealing. The complaint also alleged that La Belle Epoque was guilty of negligence. Double H Family moved for summary judgment, arguing that Old Europe was not a tenant under the terms of the written Lease, because the Lease was executed between Desbois and Double H Family and did not allow for assignments without the written consent of Double H Family. In addition, Double H Family argued that Old Europe had not alleged or offered evidence to establish that Double H Family had breached its duty to refrain from willful injury or entrapment. La Belle Epoque moved to dismiss the complaint, or, in the alternative, moved for summary judgment, arguing that Old Europe did not allege or offer evidence showing that La Belle Epoque breached its duty under Maryland law; that is, to refrain from willful injury or entrapment of a trespasser.

On May 16, 2006, the Circuit Court granted summary judgment in favor of Double H Family and La Belle Epoque on all counts.[7] The court explained:

I really don't see that there's any facts to support that Ms. Tintenier is a tenant.... She always operated as an agent for the actual tenant, Mr. [Desbois].... I think there

---

6. This fact is not significant to our analysis because the losses complained about in this action occurred prior to April 1, 2003.

7. The court entered a written order on May 26, 2006, incorporating its oral judgment of May 16, 2006.

is a valid statute of frauds issue. I certainly think that if she's not the tenant, which the [c]ourt finds that she wasn't, she would either be a trespasser or a bare licensee. And certainly, it's true then the duty would be not anything other than just willful injury. And there is nothing like that alleged here.

On May 26, 2006, Sanchez–Tintenier filed a notice of appeal to the Court of Special Appeals. On August 30, 2007, the intermediate appellate court issued an unreported opinion vacating the judgment of the Circuit Court. The Court of Special Appeals held that the Circuit Court correctly concluded that "Old Europe cannot assert the rights of an assignee under the Lease against Double H Family." Ultimately the court held that the Circuit Court "erred in concluding as a matter of law that there was no tenancy relationship." The intermediate appellate court explained:

An occupant who is present with the landlord's knowledge and pays rent may have a common law tenancy giving rise to a suit that is not barred by the statute of frauds.

\* \* \*

On this record, Old Europe could establish a month-to-month tenancy under common law, because rent payments were made one month in advance, after Tintenier notified Dant that she was taking over for Desbois, and Dant agreed to that arrangement on behalf of Double H Family. Contrary to Double H Family's contention, there is ample evidence from which a reasonable person might conclude that Double H Family was aware of Old Europe's tenancy, accepted it, and therefore "granted possession" of the premises to Old Europe.

Furthermore, the court held that the Circuit Court erred in concluding that Double H Family could not be liable under established negligence principles governing liability to occupiers of land. The intermediate appellate court explained:

As owner of the property, Double H Family occupied and controlled the common area where *La Belle Epoque* allegedly placed water-collecting and -diverting junk. According

to Kressin, he and his agents were aware before the flood that the common area adjacent to La Belle Epoque's premises "resembled a junk yard," and he instructed Dant to have it cleaned up. In the aftermath of the storm, water that was allegedly collected and redirected as a result of the debris infiltrated both La Belle Epoque's and Old Europe's premises. In these circumstances, a reasonable person could conclude that Double H Family breached its duty of care to Old Europe.

The Court of Special Appeals further held that the Circuit Court erred in granting summary judgment in favor of La Belle Epoque. The intermediate appellate court stated: "[T]here is evidence from which a fact finder might conclude that La Belle Epoque's activities on or around its premises (i.e., storing junk) proximately caused the flood that damaged Old Europe's property."

## DISCUSSION

### Standard of Review

In *Anderson v. The Gables*, 404 Md. 560, 948 A.2d 11(2008), we summarized the standards applicable to our review of the grant of a motion for summary judgment:

In considering a trial court's grant of a motion for summary judgment, this Court reviews the record in the light most favorable to the non-moving party. *Bednar v. Provident Bank of Maryland, Inc.*, 402 Md. 532, 542, 937 A.2d 210, 215 (2007); *Rhoads v. Sommer*, 401 Md. 131, 148, 931 A.2d 508, 518 (2007) ("We review the record in the light most favorable to the non-moving party and construe any reasonable inferences that may be drawn from the facts against the moving party"); *Harford County v. Saks Fifth Ave. Distribution Co.*, 399 Md. 73, 82, 923 A.2d 1, 6 (2007) (In reviewing a trial court's decision on a motion for summary judgment, "we seek to determine whether any material facts are in dispute and, if they are, we resolve them in favor of the non-moving party"); *Serio v. Baltimore County*, 384 Md. 373, 388–89, 863 A.2d 952, 961 (2004); *Lovelace*

*v. Anderson,* 366 Md. 690, 695, 785 A.2d 726, 728 (2001) (In reviewing a grant of the defendants' motions for summary judgment, "we must review the facts, and all inferences therefrom, in the light most favorable to the plaintiffs"). If no material facts are placed in genuine dispute, this Court must determine whether the Circuit Court correctly entered summary judgment as a matter of law. *See* Maryland Rule 2–501(f); *Bednar,* 402 Md. at 532, 937 A.2d at 216; *Saks,* 399 Md. at 82, 923 A.2d at 6; *Prop. and Cas. Ins. Guar. Corp. v. Yanni,* 397 Md. 474, 480, 919 A.2d 1, 5 (2007); *Standard Fire Ins. Co. v. Berrett,* 395 Md. 439, 451, 910 A.2d 1072, 1079 (2006); *Ross v. State Bd. of Elections,* 387 Md. 649, 659, 876 A.2d 692, 698 (2005).

*Anderson,* 404 Md. at 571, 948 A.2d at 18. In addition, "when reviewing the grant of a motion for summary judgment, ordinarily, [our review] is limited to the grounds relied upon by the [trial] court." *Deering Woods v. Spoon,* 377 Md. 250, 263, 833 A.2d 17, 24 (2003). Essentially, in reviewing a trial court's grant of summary judgment, we examine "the same information from the record and determine the same issues of law as the trial court." *Miller v. Bay City,* 393 Md. 620, 632, 903 A.2d 938, 945 (2006). We only look to the evidence submitted in opposition and support of the motion for summary judgment in reviewing the trial court's decision to grant the motion. *Miller,* 393 Md. 620, 903 A.2d 938; *Livesay v. Baltimore,* 384 Md. 1, 10, 862 A.2d 33, 38 (2004).

## Breach of Contract and the Covenant of Good Faith and Fair–Dealing

Old Europe contends that Double H Family breached the original Lease between Double H Family and Desbois (purportedly transferred to Old Europe) and violated the covenant of good faith and fair-dealing by failing to provide a rental space fit for ordinary use. Old Europe posits that it is a valid assignee of the Lease and that Double H Family waived its ability to contest the assignment to Old Europe when it accepted Old Europe's rent with knowledge of Old Europe's presence on the premises. To establish that Double H Family

knew of and consented to a landlord-tenant relationship, Old Europe points to the change in the signage on the building,[8] its payment of seventeen consecutive months of rent,[9] and the timely response by Double H Family's agent in making repairs to the shop during the alleged assignment period. Old Europe also contends that the Court of Special Appeals was correct in its conclusion that it was a commercial tenant at common law. Further, Old Europe argues that it was a periodic tenant of Double H Family based upon its entry onto the premises and subsequent payment of rent. In that regard, Old Europe relies primarily on *Annapolis Fire v. Rich,* 239 Md. 573, 212 A.2d 249 (1965).

Double H Family contends, however, that the Court of Special Appeals's holding erroneously creates a "commercial tenancy" at common law. Specifically, it argues that "the payment of rent by a non-tenant is insufficient to create a new 'commercial tenancy' in favor of the entity making the payment." Double H Family posits that Old Europe was never a tenant because Double H Family, as landlord, never granted Old Europe the right of possession. In this regard, Double H Family argues that the attempted assignment of the leasehold from Desbois to Old Europe was invalid because Desbois provided no written notice of the assignment to Double H Family as required by the written Lease; and, moreover, prior to the flood, Desbois failed to provide any notice of the assignment whatsoever (verbal or written).

In addition, Double H Family contends that an employee's continued presence at a place of employment and payment of rent is insufficient to create a "commercial tenancy" by operation of Maryland law. Double H Family specifically points out that this case is distinguishable from *Annapolis Fire* because in that case, "the tenant clearly and unambiguously gave verbal or written notice that an assignment occurred, and the

---

8. The record reveals, however, that the change in the building's sign occurred after the flood.

9. The record reveals that Sanchez–Tintenier only made six to seven rent payments prior to the February 2003 flood.

landlord consented to the change in the lease's terms." Pertinent to this contention, Double H Family argues that the only verbal or written notice of intent it received from Sanchez–Tintenier was when she stated "[I am] going to take care of the store" and that this statement is ambiguous and implies "a future action" or "one that has not come to fruition yet." Moreover, Double H Family asserts that under Maryland law, a landlord must have clear notice of and consent to its involvement in a "commercial tenancy" and that holding otherwise will create ambiguity and inconsistency in landlord/tenant relationships.

In essence we are asked to determine, for purposes of our review of a grant of summary judgment, whether on the record before us, Old Europe held a legally cognizable property interest in the premises known as 4124–F Howard Avenue at the time of the flood. First, we must determine whether Desbois made a valid assignment of the original Lease to Sanchez–Tintenier. This requires us to determine if the alleged assignment is enforceable in accordance with the written Lease between Double H Family and Desbois and in accordance with the Maryland Statute of Frauds.

A lessee may transfer his or her interest in a lease agreement by assignment. *Italian Fisherman v. Middlemas,* 313 Md. 156, 163, 545 A.2d 1, 4 (1988). When a lease is assigned, an assignee "steps into the lessee's shoes and acquires all the lessee's rights in the lease." *Italian Fisherman,* 313 Md. at 163, 545 A.2d at 4. Privity of estate ends between the lessor and lessee and is created between the lessor and the assignee. *Italian Fisherman,* 313 Md. at 163, 545 A.2d at 4. Contractual rights are assigned when the assignor manifests the intent to make the assignment. *See Central Collection v. Columbia Medical,* 300 Md. 318, 331, 478 A.2d 303, 309 (1984) ("In determining the validity of [the] assignment we look to the intent of the parties."); *accord* E. ALLEN FARNSWORTH, FARNSWORTH ON CONTRACTS, *Assignment and Delegation,* § 11.3 at 69 (3rd ed. 2004) ("Whether the owner of a right has manifested an intention to transfer it is a question of

contract interpretation to be answered from all the circumstances, including words and other conduct.").

■ For an assignment of a leasehold interest to be enforceable, however, it must comply with provisions found within the original lease agreement and applicable statutory law. *See Julian v. Christopher,* 320 Md. 1, 7, 575 A.2d 735, 737 (1990) ("Contractual restrictions on alienability of leasehold interests are permitted."); *See also Lamm v. Port Deposit Homestead Association,* 49 Md. 233, 240 (1878) (explaining that the Statute of Frauds applies to contracts for the sale of land and in any interest in or concerning them). In pertinent part, the Lease between Desbois and Double H Family stated: "Tenant will not assign this Lease, in whole or in part, or sublet all or any part of the Premises, without first obtaining the Landlord's written consent. . . . The acceptance by Landlord of the payment of rent following any assignment or subletting shall not be deemed to be a consent by the Landlord to such assignment or subletting."

On this record, there is no evidence of any writing purporting to assign Desbois's leasehold interest prior to the flood. There is also no evidence that Desbois notified Double H Family verbally or in writing of his intent to assign his leasehold interest to Sanchez–Tintenier. There is, however, evidence that Sanchez–Tintenier, who often interacted with Double H Family on Desbois's behalf, notified Double H Family's agent, Michael Management, Inc., that she was "taking over" the premises and that Desbois no longer wanted the store. During this conversation, David Dant indicated to Sanchez–Tintenier that it would be "no problem" and "fine" for her to takeover. The record further indicates that Double H Family accepted rent payments from Sanchez–Tintenier (rather than Desbois) for several months after this conversation.

■ We hold that the record before us presents genuine issues of material fact regarding whether Double H Family waived its ability to contest the validity of the assignment from Desbois to Sanchez–Tintenier under the terms of the

Lease and whether Double H Family is estopped from arguing the assignment is non-enforceable under the Statute of Frauds.[10] A party waives a contractual right by intentionally relinquishing the right or engaging in conduct that warrants the inference that the right has been relinquished. *Food Fair v. Blumberg,* 234 Md. 521, 531, 200 A.2d 166, 172 (1964). Whether a waiver has taken place is generally an issue of intent, which is determined by the factual circumstances of each case. *See Chertkof v. Southland Corp.,* 280 Md. 1, 6, 371 A.2d 124, 127 (1977) ("We have, in common with many other courts, treated waiver of a breach by the acceptance of rent as a matter of intent, which necessarily turns on the factual circumstances of each case."); *Chas. J. Frank, Inc. v. Assoc. Jewish Ch.,* 294 Md. 443, 449, 450 A.2d 1304, 1306–07 (1982). Generally under Maryland law, when a lessor accepts rent from a new entity with knowledge that the lease has been assigned to that entity, the lessor waives the ability to contest the assignment under a lease covenant that provides the lease may not be assigned without the lessor's written consent. *See Chertkof,* 280 Md. 1, 371 A.2d 124 (Landlord's acceptance of rent from assignee for two years, along with repeated negotiations to renew lease, constitutes waiver of the breach of covenant prohibiting the assignment of the lease without consent); *See also* RICHARD POWELL, POWELL ON REAL PROPERTY, § 17.04(2)(a) at 17–50 (Michael A. Wolf ed. 2000) ("Although the mere acceptance of rent after a prohibited assignment will not normally be considered a waiver, continued acceptance of rent coupled with knowledge of the assignment generally is construed as a waiver."); *accord Sarete, Inc. v. 1344 U St. Ltd. P'ship,* 871 A.2d 480 (D.C.2005).

■■■■■■ On this record, a trier of fact could also find that an assignment occurred by operation of law and that Double H Family is estopped from contesting its validity pursuant to

---

**10.** To determine if Double H Family waived the terms of the Lease and the Statute of Frauds it is necessary for the trier of fact to determine if, through its agent Michael Management, or otherwise, Double H Family gained sufficient knowledge of the alleged assignment to Old Europe (Sanchez–Tintenier) and Old Europe's rental payments.

Md.Code (1974, 2003 Repl.Vol.), Real Property Article § 5–103. According to § 5–103: "No corporeal estate, leasehold or freehold, or incorporeal interest in land may be assigned, granted, or surrendered, unless it is in writing signed by the party assigning, granting, or surrendering it, or his agent authorized lawfully by writing, or by act and operation of law." An assignment that occurs by act and operation of law escapes the purview of § 5–103's writing requirement. *See Prevas v. Gottlieb*, 229 Md. 188, 193–194, 182 A.2d 489, 492–93 (1962) (illustrating that "act and operation of law" does not involve a writing, but refers to conduct a party engages in that may not be denied because of the principal of estoppel). A leasehold interest in land is assigned, granted, or surrendered by operation of law when the parties form the common intent for the assignment, grant, or surrender to take place and then engage in acts that are "tantamount to a stipulation" to effectuate the assignment. *See Eidelman v. Walker & Dunlop*, 265 Md. 538, 544, 290 A.2d 780, 784 (1972) (explaining how a surrender occurs by operation of law under § 5–103); *See also Prevas*, 229 Md. at 193–194, 182 A.2d at 492–93.

We conclude, on the basis of the record before us, that a reasonable trier of fact could find that the attempt to assign the leasehold estate to Old Europe was a departure from the terms of the written Lease and constituted a transfer within the Statute of Frauds. Notwithstanding the terms of the Lease and the requirements of the Statute of Frauds, the trier of fact could find that Double H Family waived both the requirements of the Lease and the Statute of Frauds. As a result of these findings, the trier of fact could conclude that Old Europe stands in the shoes of the original tenant, Debois, pursuant to the original Lease. Thus, based upon a determination that the leasehold was transferred by operation of law, the trier of fact could then decide the merits of Old Europe's breach of contract and breach of covenant of good faith and fair dealings claims. Accordingly, we disagree with the Court of Special Appeals's conclusion that the Circuit Court correctly determined that Old Europe, as a matter of law, cannot assert

the rights of an assignee under the Lease entered into between Double H Family and Desbois.

Assuming there was no assignment by operation of law, Old Europe posits that its possession of the leased premises and payment of rent to Double H Family created a tenancy at common law.[11] Old Europe cites *Annapolis Fire* to support this position. In *Annapolis Fire*, General and Excess Underwriters, Inc., the original tenant under a written lease, notified the landlord that two other entities would begin leasing the premises along with it. 239 Md. at 578, 212 A.2d at 252. The landlord expressly agreed to this arrangement and confirmed that agreement in writing. *Annapolis Fire*, 239 Md. at 578–79, 212 A.2d at 252. This Court concluded that the parties' oral agreement to add the two new tenants constituted a surrender of the original lease between the original parties and the creation of a new agreement between the landlord and all three tenants. *Annapolis Fire*, 239 Md. at 585, 212 A.2d at 255. When the oral tenancy expired and the two newer tenants stayed on, we held they had a common law periodic tenancy, reasoning that such a tenancy is implied when one is both in possession of the premises by grant of the owner and pays rent to the owner. *Annapolis Fire*, 239 Md. at 582, 585, 212 A.2d at 254.

Here, in order to determine if Old Europe established a common law tenancy (or "commercial tenancy") in the premises at 4124–F Howard Avenue, it is first necessary to determine whether Desbois surrendered his existing leasehold interest in the premises. Surrenders, like assignments, are subject to § 5–103 and can arise by act and operation of law. For this to occur, both parties to the original lease agreement must evidence the common intent to relinquish their legal relationship and take actions that clearly evidence that intent. *Eidelman*, 265 Md. at 543–44, 290 A.2d at 783–84; *Prevas*, 229 Md. at 193, 182 A.2d at 492; *accord Beall v. White*, 94 U.S.

---

11. We were not asked to decide, nor have we decided, whether Old Europe may have had a valid property interest in 4124–F Howard Avenue under a sublease.

382, 389, 24 L.Ed. 173 (1876) (A surrender occurs by operation of law "when the parties without express surrender do some act which implies that they have both agreed to consider the surrender as made."). Determinations of whether a surrender has occurred are made on a case by case basis and are generally a matter for the trier of fact. *See Eidelman,* 265 Md. at 543, 290 A.2d at 783.

 A surrender of the original leasehold interest occurred in *Annapolis Fire* when the original tenant expressly indicated to the landlord that the tenant wished to share his leasehold interest in the premises with two other tenants, the landlord clearly agreed to this arrangement (verbally and in writing), and the parties engaged in conduct consistent with this agreement. It was only after the surrender of the original lease that the new lease between the three entities, and later the periodic tenancy, came into existence. The record before us, and the reasonable inferences drawn therefrom, presents genuine issues of material fact as to whether Desbois and Double H Family surrendered their lease agreement.

Intent is a key inquiry in this case. The trier of fact must determine whether Double H Family and Desbois intended to surrender the Lease and/or whether Double H Family intended to accept Old Europe as an assignee under the Lease, and whether Double H Family, by its actions, waived the requirements of the Lease and Statute of Frauds.[12] If the trier of fact determines that Desbois and Double H Family surrendered the Lease agreement, then the inquiry properly turns to whether Old Europe acquired a common law tenancy in the premises.

### Negligence Counts Against Double H Family and La Belle Epoque

Double H Family and La Belle Epoque contend that because Old Europe was not an authorized tenant of 4124–F

---

12. A trier of fact might also, of course, determine that none of these things occurred.

Howard Avenue, it may only be considered a trespasser or a bare licensee to whom a minimum duty, i.e., the duty to avoid willful injury or entrapment, was owed. Additionally, Double H Family posits that it owed no duty to maintain the common areas under the Lease agreement because the Lease specifically designated this responsibility to the tenant. It further states that even if it did reserve control over the common areas in the Lease agreement, it exercised the reasonable care and diligence required of it to maintain such areas. Old Europe argues that it had a lawful tenancy in the premises and was owed, at the minimum, a duty of reasonable care.

 Upon review of the record, we agree with the Court of Special Appeals that the Circuit Court erred in concluding that Old Europe was a bare licensee or a trespasser as to the negligence counts against Double H Family and La Belle Epoque. We have determined that a genuine dispute of material fact exists concerning Old Europe's status as an assignee under the Lease and whether the Lease between Desbois and Double H Family was surrendered. If a trier of fact finds that Old Europe had a valid leasehold interest, then the trier of fact must also determine if Double H Family breached duties owed to Old Europe by virtue of Maryland law and/or the Lease agreement.[13]

---

**13.** Even assuming *arguendo* that Old Europe did not gain a leasehold interest in the premises, the facts before us do not support the Circuit Court's conclusion that Old Europe was on the premises as a trespasser or bare licensee. If Old Europe acquired no leasehold interest, then Desbois remained the tenant of the premises at all times and as leaseholder, was entitled to invite others to enter and occupy the leased premises. The facts before us establish that Old Europe was present on the premises at 4124–F Howard Avenue at Desbois's invitation and with his consent. A trial court's determination of an individual's status on the subject premises, at the time of the injury, is not necessarily affected by the consent (or lack thereof) of the landlord if the tenant consented to the individual's presence. *See* PROSSER & KEETON, THE LAW OF TORTS § 63, at 434 (W. Keeton 5th ed. 1984) ("When land is leased to a tenant, the law of property regards the lease as equivalent to a sale of the premises for the term. The lessee acquires an estate in the land, and becomes for the time being both owner and occupier, subject to the responsibilities of one in possession, to those who enter upon the land

 If we assume *arguendo* that Old Europe acquired a leasehold interest and that the alley involved in this case is a common area, it is well established, under Maryland law, that a landlord ordinarily has control over the common areas, and has a duty to avoid unreasonable risks of harm to others caused by activities conducted within the common areas. *See Langley Park Apts. v. Lund, Adm'r,* 234 Md. 402, 407, 199 A.2d 620, 623 (1964) ("[W]here a landlord leases separate portions of his property to different tenants and reserves under his control the passageways and stairways, and other parts of the property for the common use of all the tenants he must exercise ordinary care and diligence to maintain the retained portions in a reasonably safe condition."); *See also Matthews v. Amberwood,* 351 Md. 544, 557–58, 719 A.2d 119, 125 (1998) (A landlord may be held liable for neglecting to remedy defects or dangers in an area that the landlord controls.). Moreover, Maryland law provides that a landlord may not include exculpatory clauses within leases that exempt the landlord from liability for harm that occurs in areas that the landlord controls. Md.Code (1974, 2003 Repl. Vol), § 8–105 of the Real Property Article; *See also Prince Philip Partnership v. Cutlip,* 321 Md. 296, 304, 582 A.2d 992, 995 (1990); *Adloo v. H.T. Brown,* 344 Md. 254, 259, 686 A.2d 298, 301 n. 4 (1996). Accordingly, upon the record before us, if a reasonable trier of fact finds that Double H Family maintained control of the alley at issue in this case, the trier of fact could also conclude that Double H Family breached its duty to exercise reasonable care in maintaining the alley.

 As to La Belle Epoque, it would be liable for its own negligence for injury caused to others resulting from the placement of debris in the alley, whether or not the alley is considered a common area. *See Frenkil v. Johnson,* 175 Md. 592, 599, 3 A.2d 479, 482 (1939) ("[O]ne must use their own rights and property so as to do no injury to those of others."); *Rosenblatt v. Exxon,* 335 Md. 58, 76, 642 A.2d 180, 189 (1994)

---

and those outside its boundaries."); *accord Henley v. Prince George's County,* 305 Md. 320, 338, 503 A.2d 1333, 1342 (1986).

("[T]he occupier of land owes a duty to occupants of neighboring land to use care when conducting activities on the land so as to avoid harm to the neighboring land."). When a person elects to do or keep something on his or her property that exposes neighboring property to danger, that person has a duty to make the condition reasonably safe. *Toy v. Atlantic Gulf & Pacific Co.*, 176 Md. 197, 213, 4 A.2d 757, 765 (1939). A person who negligently fails to make the condition reasonably safe can be liable for harm that the condition causes to neighboring premises. *See Toy*, 176 Md. at 213, 4 A.2d at 765; *See also Frenkil*, 175 Md. at 600, 3 A.2d at 482. We hold that a reasonable trier of fact could conclude that the pile of trash and debris that La Belle Epoque allegedly allowed to accumulate in the alley constituted a dangerous condition on the premises and that La Belle Epoque failed to remove the debris or protect others from that condition. Therefore, we conclude that genuine issues of material fact exist regarding whether La Belle Epoque negligently caused injury to Old Europe. As such, we shall remand this matter to the Circuit Court for further proceedings consistent with this opinion.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED WITH COSTS.**

HARRELL, J. and RAKER, J. join judgment only.